SHARLOW, Plaintiff in error, v. STATE, Defendant in error.

*No. State 145.   Argued May 1, 1970.—Decided June 2, 1970.*
(Also reported in 177 N. W. 2d 88.)

For the plaintiff in error there was a brief by *Leonard S. Zubrensky,* attorney, and *Herbert S. Bratt* of counsel, both of Milwaukee, and oral argument by *Mr. Zubrensky.*

For the defendant in error the cause was argued by *Theodore J. Hodan,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, and *E. Michael McCann,* district attorney.

HANLEY, J.  Defendant seeks the reversal of the judgment of conviction or, in the alternative, a new trial on the ground of alleged prejudicial error committed by the trial court. This alleged error raises the issue as to whether Officer Zellmer's testimony concerning defendant's confession was admissible. A question also arises as to whether, having expressly declined to challenge the statement at the time of trial, he can now raise the issue of admissibility.

At the trial Officer Zellmer was asked what, if anything, the defendant had told him concerning the offense with which he was charged. Officer Zellmer replied:

"*A.* Regarding the offense, he related that on Monday, November 18, 1968, at about 3:00 a. m. he went to the home of a friend, Ronald Winters at 1253 North 26th Street in the City of Milwaukee and in the home he had

met the complainant, Raymond Olkowski, and he stated that it was his observation that the complainant was trying to make out or make a date with some of the girls at the party and shortly thereafter, that Ronald Winters approached him in the kitchen and stated that Raymond had about $400 in his wallet and asked him that if he would roll him, which he agreed to do.

"Shortly thereafter the defendant stated that the complainant wasn't able to make out with any of the girls at the party; that he wanted to go home and the defendant insisted on taking him home. He says he went into the defendant's auto—the complainant—and it was in the back seat; and he drove the auto into an alley in the 2600 block of West Cherry in the City of Milwaukee; and at this time he stopped the auto and stated that he got into an altercation with the complainant regarding the complainant trying to make out with the girls at the party and that he slapped the complainant. And then he pulled the complainant from the back seat into the front seat of the car, where he had some more contact and wrestling continued outside the automobile, where he said he ripped the jacket off the complainant and that he hit him with his fists.

"He stated he took the complainant's wallet and identification and the jacket and threw it in the car, but he stated at the time he—there was no money in this wallet and he then got into the car and returned to the home of Ronald Winters and just outside Ronald Winters' home that he had looked in the jacket and there he found about $30.00."

It should be noted that no objection was raised as to this testimony at the time of trial. Immediately following Officer Zellmer's testimony the prosecution suggested that any testimony on the part of the defendant as to the voluntariness of his confession should be given at that point. The trial judge then noted that any objection as to admissibility should have been made as soon as the prosecution asked, "What, if anything, did he tell you, officer?" but stated ". . . if counsel for the defense wishes to explore that further, I will accord him the opportunity to do so." Defense counsel then expressly

declined either to cross-examine the police officer or introduce additional evidence concerning the voluntariness of the defendant's confession.

*Defendant's right to challenge admissibility of his confession.*

In *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, this court, in compliance with *Jackson v. Denno* (1964), 378 U. S. 368, 84 Sup. Ct. 1774; 12 L. Ed. 2d 908, adopted the "orthodox procedure" in determining the voluntariness of a confession. Under this procedure a separate hearing is had before the trial judge (outside the presence of a jury) and he alone determines the issue of voluntariness. If he finds that the confession is involuntary, the jury is not allowed to hear such confession. If, however, he determines that it was voluntary, the confession is admitted, and the jury is allowed to consider its weight and credibility. *Goodchild*, however, contemplated that this hearing on voluntariness be held prior to trial.

In the instant case no such hearing was conducted prior to or during the defendant's trial, because, as in *Goodchild*, no objection to the admission of the confession was raised. When faced with the question of whether one can waive a constitutional error concerning admissibility of a confession, this court in *Goodchild* held that such was possible if done as a deliberate defense tactic.

In so deciding, this court relied upon *Henry v. Mississippi* (1965), 379 U. S. 443, 85 Sup. Ct. 564, 13 L. Ed. 2d 408. In *Henry* evidence which was admitted at trial without objection was attacked on appeal to the Mississippi Supreme Court as having been obtained as a result of an illegal search. The Mississippi court determined that failure to object was fatal to the defendant's appeal. The United States Supreme Court then held that Mississippi's contemporaneous-objection rule served a

legitimate state interest by avoiding delay in the disposition of cases but remanded the case so that testimony could be taken concerning *whether defense counsel knowingly waived objection to the evidence for purposes of trial strategy.*

From a reading of *Goodchild* and *Henry* it would appear that this court could affirm the trial court based on defendant's having waived his right to attack the admission of his confession. However, unless this court finds the instant record sufficient to establish that defense counsel did not object because of trial strategy, it would be compelled to order a separate hearing such as was required by the Supreme Court's mandate in *Henry.* We do not think the record supports such a finding. We will, therefore, consider the defendant's arguments on their merits.

### *Admissibility of defendant's confession to Officer Zellmer.*

In determining the admissibility of the defendant's confession it is necessary to consider the occurrences leading to its alleged utterance. The record indicates that following the robbery with which he was charged, the defendant was incarcerated in the county jail at Forest Park, Illinois. The record, however, is not clear as to the reason for defendant's arrest and incarceration in Illinois.

Having learned of the defendant's incarceration, Officer Zellmer and his partner went to Forest Park to execute the Wisconsin warrant for the defendant's arrest. Upon arriving at Forest Park, the officers were informed that before getting custody of the defendant, it would be necessary to initiate extradition proceedings. The defendant was thus taken before Illinois Judge JAMES BOYLE where he apparently signed a waiver of extradition.

Following release by the Illinois officials, the defendant was driven back to Milwaukee. During the return trip which commenced in the early afternoon on December 5, 1968, Officer Zellmer discussed the charge against the defendant and questioned him concerning the charge. The allegedly tainted statements which formed the basis of Officer Zellmer's testimony were made by the defendant both while on route to Milwaukee and after his arrival at the safety building in Milwaukee.

The defendant's first attack upon the admissibility of his confession is that the state has not met its burden of proof concerning voluntariness. As indicated in *Goodchild,* the burden is upon the state to prove voluntariness beyond a reasonable doubt.

Relying on *Davis v. North Carolina* (1966), 384 U. S. 737, 86 Sup. Ct. 1761, 16 L. Ed. 2d 895, which also considered the voluntariness of a confession, the defendant contends that this court must make an independent determination as to whether his statements were voluntarily given. Such contention is, of course, contrary to this court's holding in *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466, wherein it was held:

"Where the court has made detailed findings of facts as was done here, our review of the evidentiary or historical physical facts will be limited to the same review that is used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence."

*See also: State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120; *Schwamb v. State* (1970), 46 Wis. 2d 1, 173 N. W. 2d 666.

In support of his contention the defendant quotes the following language from *Davis v. North Carolina, supra,* at pages 741 and 742:

"It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confes-

sion was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness. . . ."

Although not quoted in the defendant's brief, the quotation continues:

". . . Wholly apart from the disputed facts, a statement of the case from facts established in the record, in our view, leads plainly to the conclusion that the confessions were the product of a will overborne."

A careful reading of *Davis* thus indicates that the supreme court made its own independent determination of involuntariness based upon the *undisputed* facts, and did not presume to make its own determination of those facts in dispute. It is thus apparent that this court's previous announcement in *State v. Carter, supra,* is not in conflict with *Davis v. North Carolina, supra,* and is thus the test to be applied on review.

As indicated by the defendant's brief, the trial court was confronted with a classic "swearing match" between him and Officer Zellmer. Applying the test set forth in *State v. Carter, supra,* the trial court's award of the match to the arresting officer cannot be set aside. The trial court's finding that the defendant's statements were ". . . uncontaminated by any pressure, coercion, force, duress, promises or threats and were illumined by the previous advice as to constitutional rights . . ." is supported by ample testimony.

Concerning the statements of the defendant prior to arriving at the safety building in Milwaukee, the record reveals that Officer Zellmer was asked the following questions and gave the following answers:

"*Q.* Where was the defendant turned over to you?
"*A.* He was turned over in the building of the Forest Park Police Department.
"*Q.* Did you have a conversation with the defendant at that time?

"*A.* Yes.

"*Q.* Where did that conversation take place?

"*A.* Just outside their quarters in their office area, or jail, whatever they would term it there.

" . . .

"*Q.* Do you recall what conversation you had with the defendant at that time?

"*A.* Well, I explained to him again to make sure he understood what he was charged with, about the warrant of robbery against—that John Olkowski was the complainant and told him what his rights were and asked him if he understood them.

"*Q.* Well, what did you tell him in regard to his rights?

" . . .

"*A.* Well, that he didn't have to tell us anything if he didn't want to. He had the right to remain silent; anything he would say could be used for or against him in any court. If he was without an attorney or couldn't afford one, that the State of Wisconsin would appoint one for him free of charge; and if he did want to talk to us, he could stop talking at any time, if he did talk, he could stop talking and he didn't have to answer any questions.

"*Q.* Did the defendant make any response to that advice?

"*A.* Not at that particular moment, no.

"*Q.* Did he make any response so far as you can remember?

"*A.* He said he understood them, but he mentioned he didn't have any money for an attorney and said he wanted to get one appointed for him.

"*Q.* And what, if anything, did you tell him in response to that?

"*A.* We said, 'Well, if you cannot afford an attorney, the State would appoint one for you free of charge.'

"*Q. Did you give him any advice as to when the attorney could be present?*

"*A.* Yes.

"*Q. What advice did you give him as to that?*

"*A.* ['] *Well, if you are going to tell us anything, if you want to, you have a right to have an attorney here now if you want one.*[']

"*Q. What, if anything, did he say in regard to that?*

"*A. He just indicated that he understood what we were talking about.*

"*Q. Did you or anyone in your presence make any promises to the defendant in order to induce him to make any statements to you?*

"*A. No, I did not.*

"*Q. Did you or anyone in your presence make any threats against the defendant or coerce him in any way in order to induce him to make statements to you?*

"*A. No, I did not.*

"*Q. Did the defendant make any requests of you that were denied prior to his making any statements to you?*

"*A. Not to my knowledge.*" (Emphasis supplied.)

Concerning statements made by the defendant after being taken to the safety building, the record reveals the following questions of and responses by Officer Zellmer:

"*Q.* After you got back to Milwaukee, where, if anywhere, did you take the defendant?

"*A.* He was taken up to the Detective Bureau assembly area.

"*Q.* Did you have a conversation with the defendant there?

"*A.* I did.

"*Q.* Prior to that conversation, did you give the defendant any advice?

"*A.* I advised him of his rights again in detail, went through and made sure he understood them.

"*Q.* What advice did you give him at that time?

"*A.* Advised him of his rights to an attorney; advised him of the right to remain silent; that he didn't have to answer any questions if he didn't want to; that anything he said would be held against him or could be used for him in any court; if he didn't have an attorney, one could be appointed for him by the State free of charge; and *if he did want to say anything, he had a right to stop any time; he had a right to have an attorney present there.* I did this because from talking to the individual, he related on the way back to Wisconsin that he had this previous injury where he suffered headaches and loss of memory from time to time. He re-

lated this on the way back to Wisconsin. I wanted to make sure that he really knew what I was talking about, so I went through this thing again.

"*Q.* What, if anything, occurred after you advised the defendant of his constitutional rights back at the Safety Building here in Milwaukee?

"*A.* Well, he related a similar story as he did when he was up here before, that he had contact—had some contact with this Mr. Olkowski in some tavern earlier on this particular day." (Emphasis supplied.)

The defendant's second attack upon the admissibility of his confessions is that under *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, all statements made by him after his request for counsel are inadmissible.

In support of this contention he quotes *Miranda* as follows, at pages 444 and 445 and 474, respectively:

". . . If, however, [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. . . ."

". . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. . . ."

In the instant case, the record reveals that when told of his rights the defendant stated he understood his rights and, since he could not afford an attorney, he would like one appointed. Officer Zellmer then informed him that the state would appoint one free of charge and then indicated that defendant need not answer any questions without his attorney being present. Although no threats or promises were made, the defendant made statements and gave his "side of the story."

Taken out of context these quotations would seem to necessitate a black-letter rule. However, a reading of them in context suggests that, even after requesting

counsel, a defendant may change his mind and volunteer a statement. In such case it is, of course, the state's burden to establish voluntariness.

Recently, in *Wright v. State* (1970), 46 Wis. 2d 75, 88, 175 N. W. 2d 646, noting that a confession can be a completely voluntary statement or a product of police questioning, this court held:

". . . An individual in custody who has claimed the right to remain silent under *Miranda* has the right to change his mind and to decide to volunteer a statement."

The question before this court is thus whether *Miranda* requires the carte blanche rule of no admissibility following request of counsel.

*Miranda* states at page 475:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U. S. 478, 490, n. 14. . . ."

"*Miranda* does not exclude the possibility that an accused may waive his rights, but the waiver may not be sought by further use of 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Miranda v. Arizona, supra,* at page 467." *State v. La Fernier* (1967), 37 Wis. 2d 365, 377, 155 N. W. 2d 93.

The trial court in ruling on this question stated:

". . . Where a defendant has expressed an understanding of his constitutional rights, even though he has expressed an intent to get an attorney . . . [such does not block] an officer from any further attempt to obtain information."

We conclude that *Miranda* does not require the carte blanche rule of no admissibility following request of counsel.

In the instant case, from the facts of the record, we are satisfied the state has met its burden of showing that the defendant intelligently waived his right to remain silent and that he volunteered his oral statement.

*By the Court.*—Judgment and order affirmed.