STATE, Respondent, v. WALLACE, Appellant.

*No. State 32. Argued March 28, 1973.—Decided June 5, 1973.*
(Also reported in 207 N. W. 2d 855.)

68

For the appellant there were briefs and oral argument by *Charles Rowan* of Milwaukee.

For the respondent the cause was argued by *Robert D. Martinson*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HANLEY, J. Four issues are presented on this appeal:

1. Did defendant's statement flow from an invalid arrest made without warrant or probable cause and, if so, was it error for the trial court to admit it into evidence regardless of whether or not it was voluntarily made;

2. Was the period of defendant's detention prior to his being taken to a magistrate unreasonable;

3. Under all of the circumstances of this case, was the statement admitted into evidence freely and voluntarily given; and

4. Was it prejudicial error for the trial court to have permitted the jury to view the pictures of the victim's body?

*Confession as flowing from an invalid arrest.*

Defendant contends that it was error for the trial court to have admitted the statements made to Manian on the grounds that they were "constitutionally tainted" by an invalid arrest without warrant and without probable cause with principal reliance placed on *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441, and its "fruit of the poisonous tree" doctrine.

Defendant's argument is predicated on the fact that on May 27, 1970, the Milwaukee police department had

its original 1965 warrant for the abandonment of a child dismissed on the ground that it had not been issued by a neutral and detached magistrate and another one substituted in its place. This second warrant, which is the one presented to the defendant in Denver, and the one upon which his extradition was founded, was also subsequently dismissed on June 16, 1970, as not being sufficient.

Since there was no valid warrant on abandonment and no warrant on the murder charge, the Milwaukee detectives must establish that they had probable cause to arrest the defendant on a charge of murder. Absent a showing of independent probable cause for his arrest for murder, any confession made flowed directly from the invalid arrest and therefore was "tainted" by it and consequently should have been excluded.

During the course of the *Goodchild* hearing, defense counsel attempted to examine both Detective Jones and Assistant District Attorney Manian concerning their reasons for suspecting the defendant of the crime in the first instance. The trial court sustained the objections of the state to such questions on the ground that a *Goodchild* hearing is only concerned with the essential circumstances surrounding a confession and because a determination on the issue of probable cause for the arrest on murder had already been determined favorably to the state, or was certainly by this point in the proceedings deemed waived. However, at the close of the hearing and with the complete transcripts of several prior proceedings, all conducted before different judges, in front of him, the trial court concluded that while the defendant had preserved his right to challenge the validity of the arrest as it related to "tainting" the subsequent confession, the actual validity of the arrest for murder had not been reconciled.

After the question had been briefed and argued by counsel, the trial court nevertheless found probable cause

for defendant's arrest on murder. The trial court never alluded to whether the quantum of evidence possessed by Russ and Jones at the time of the arrest was sufficient to " '. . . lead a reasonable police officer to believe that the defendant probably committed a crime' " as stated in *State v. Doyle* (1968), 40 Wis. 2d 461, 466, 162 N. W. 2d 60, being content to base his ruling on the fact that the officers had adequately informed the defendant of the charges against him. As to the standard followed by the trial court, it was in error and upon the basis of the record before it, it should have allowed defendant to examine the arresting officers concerning the factors which led them to believe that there was probable cause to arrest defendant.

Upon an independent review of the record by this court, however, it is clear that the police did have probable cause to arrest the defendant for murder, and any error on the part of the trial court in not permitting the defendant to examine witnesses on the question of probable cause was harmless. During the course of the trial, the court ruled that Deborah Ivy could not make an in-court identification because on the date of the murder in 1963 she was only twelve years old and at that time was only in his presence for approximately five minutes and at that she did not have a chance to see his full face. The court was also persuaded by the fact that any in-court identification might be "constitutionally tainted" by the fact that in 1963 she picked a photograph of the defendant out of about 100 other photographs shown to her by the police and which apparently had been periodically reshown to her by the police over the course of the past seven years on at least four occasions, including the evening of the lineup, with conflicting testimony as to whether she was shown them before or after she viewed the defendant in the show-up.

Subsequently, the state attempted to introduce the photograph into evidence, and at that point, another

hearing outside the presence of the jury was conducted concerning it. Captain Russ testified that on several occasions he had shown photographs of possible suspects to both Deborah Ivy and the other children present when Portia left with the man and that the defendant's picture was brought along on one such occasion because the police were interested in talking to him about his whereabouts on the night of the crime as they were looking for individuals who were known to frequent the Hillside Housing Project and the Haymarket Square area and who might have been familar with Portia Bufford. He further testified that Deborah Ivy selected the defendant's photograph from among a group of 10 shown to her on that date and she confirmed this during her *voir dire*.

Although the trial court ruled that no photographic identification could be made in the presence of the jury, on essentially the same grounds that he had earlier excluded Deborah Ivy's in-court identification, this ruling would in no way diminish the facts which were known to Captain Russ in 1963 and in 1970 at the time of defendant's arrest; namely, that an eyewitness had selected the defendant's photograph out of a group of over 150 photographs shown to her on several different occasions.

Therefore, although the trial court did err in not allowing the defendant to examine witnesses concerning the probable cause for defendant's arrest, in light of these facts later adduced, the error was harmless. There being probable cause for his arrest established, this court need not reach the question of whether the statements made were in fact "tainted" since *Wong Sun, supra,* presumes that the arrest has no foundation in probable cause. That is not the situation in the instant case.

*Period of detention.*

Defendant contends that the period of his detention prior to being taken before a magistrate was unreason-

ably long and consequently it was error to read his statement made on Monday afternoon to the jury. While the length of detention is a very important consideration in determining whether statements or a confession were voluntarily made, *State v. Herrington* (1969), 41 Wis. 2d 757, 773, 165 N. W. 2d 120, the threshold question is whether the period of detention was unreasonably long in the first instance. Statements made during a period of unreasonable detainment will be excluded whether voluntary or involuntary.

Sec. 970.01, Stats., provides:

"970.01 **Initial appearance before a judge.** (1) When any person is arrested he shall be taken *within a reasonable time* before a judge in the county in which the offense was alleged to have been committed.

"(2) When a person is arrested without a warrant and brought before a judge, a complaint shall be filed forthwith." (Emphasis added.)

This statute is a restatement of a long line of cases in which the issue of unreasonable detention has been raised. In *Phillips v. State* (1966), 29 Wis. 2d 521, 139 N. W. 2d 41, this court reiterated the fact that the *Mc-Nabb-Mallory* rule [1] providing for the exclusion of voluntary confessions where the authorities failed to promptly bring a prisoner before a committing magistrate was premised upon the high court's administration of federal criminal justice and not the due process clause of the fourteenth amendment.

Setting forth the guidelines for the rule, this court, in *Phillips, supra,* at page 535, stated:

"While one may be detained by the police and interrogated to secure sufficient evidence to either charge him with a crime or to release him, the police cannot continue to detain an arrested person to 'sew up' the case by ob-

---

[1] *McNabb v. United States* (1943), 318 U. S. 332, 63 Sup. Ct. 608, 87 L. Ed. 819, *Mallory v. United States* (1957), 354 U. S. 449, 77 Sup. Ct. 1356, 1 L. Ed. 2d 1479.

taining or extracting a confession or culpable statements to support the arrest or the guilt."

After a review of the record, the court concluded, however, that neither art. I, sec. 8—the due process clause of the Wisconsin Constitution—nor "fair play in the criminal process under our accusatorial system" was violated by questioning of a little over three and one-half hours. *Phillips, supra,* at page 536.

In *Reimers v. State* (1966), 31 Wis. 2d 457, 143 N. W. 2d 525, the defendant was first taken before a magistrate for his initial appearance on Tuesday morning despite the fact that he had been confined since early Sunday morning. Because the damaging statement was obtained and signed within the first three hours after his confinement, the court concluded that the detention was not unreasonable. Speaking through Mr. Justice BEILFUSS, the court, nevertheless, pointed out in very strong language at pages 470, 471 that:

"Upon its face, a detention from midnight Saturday until 10 a. m. Tuesday, without satisfactory explanation, would be unreasonable.

". . .

"While we are aware that magistrates cannot be available at all times in all localities, a reasonable effort should be made to accommodate the police and the defendants so that a defendant may appear to be informed of the nature of the charge against him and be admitted to bail without an unreasonable delay. *Henceforth, the fact that Sundays and holidays intervene, standing alone, will not justify unreasonable detention.*

". . .

"In this instance, and for this case, we hold the length of the detention was not unreasonable but reemphasize this court cannot continue to countenance unreasonable detention." (Emphasis added.)

Since *Reimers* was decided, this court has had occasion to consider the question of unreasonable police detention for purposes of interrogation on numerous occasions; in

each case being satisfied that the detention was not unreasonable since it was for a proper purpose and expeditiously carried out.

In light of the strong admonition in *Reimers* against unreasonably long periods of detention and because of defendant's detention over the weekend prior to his statement to Manian on Monday afternoon, the case at bar presents an unusually close factual situation for this court.

In determining the length of the defendant's detention the trial court found that it did not commence until defendant had actually arrived in Milwaukee at 11:25 a. m. on Saturday, May 30th. The trial court likewise found that although defendant's detention was long, it was under all of the circumstances reasonable in light of the seven-year interlude between the crime and subsequent arrest.

This seven-year interlude produced a problem with regard to locating witnesses such as the children who had been playing with Portia on the night she was led away. With the exception of Deborah Ivy, they were taken to the Milwaukee detective bureau on the evening of Saturday, May 30th, where they viewed the defendant in a lineup conducted there.

Milwaukee Detective Kenneth McHenry testified that on May 30th, Captain Russ assigned him as head of the investigation and at that point he began to check on the whereabouts of witnesses. Deborah Ivy, who had made a prior photo identification, was not located until about 4 p. m. on May 31st and she viewed the defendant in a show-up that evening.

These facts are somewhat similar to those in *Wright v. State* (1970), 46 Wis. 2d 75, 175 N. W. 2d 646, at page 89, which involved a detention pending the outcome of a lineup. The court stated:

"In this connection it should be mentioned that a lineup is a double-edged blade. It may strengthen the case

against a suspect: it may, and often does, result in a failure to identify that leads the state to drop its prosecution. We do not find here an unreasonable delay nor one that renders Wright's confession inadmissible."

The record discloses that in the course of his interrogation on Saturday afternoon, the defendant attempted to establish that on the particular weekend in 1963 he was at various times with Vivian Payne, a girl friend who he was living with at the time, and Junior and Darnell Faulkner who were friends of theirs. Vivian Payne had been talked to back in 1963, but her whereabouts had not been kept current. Consequently, although Detective McHenry and several other officers looked for her on Saturday, the 30th, for about three hours, she could not be located. The next day, Captain Russ procured Payne's current address and she was thereafter contacted and subsequently led them in turn to the Faulkners. On Sunday afternoon, the Faulkners and Payne were taken to the station where they met with the defendant and several detectives in an interrogation room and as it turned out, the four parties could not agree as to the various times they had spent together on the weekend of June 1, 1963.

In view of defendant's alibi, we think the police were entitled as part of their total investigation of the case to check it out.

In *State v. Hunt* (1972), 53 Wis. 2d 734, 193 N. W. 2d 858 at page 742 this court stated:

"This court has recognized that a person can be detained for a period of time after his arrest in order for authorities to determine whether to release the suspect or to make a formal complaint. *Phillips v. State* (1966), 29 Wis. 2d 521, 534, 139 N. W. 2d 41. *The detention may also continue to allow the authorities to check out the story related by either the accused or the complaining witness. State v. Fransisco* (1950), 257 Wis. 247, 43 N. W. 2d 38." (Emphasis added.)

The trial court made a specific finding that Payne and the Faulkners had been drinking before their arrival at the station and the defendant testified that the conversation was really just an argument. This in no way diminishes the fact that the police attempted to check out his story.

At the time of his arrest for murder in Denver, the defendant had volunteered to take a lie detector test and in this regard the trial court found that he was given a lie detector test at his request on Monday morning, June 1st, "the first available time." At the completion of the test, he was taken to Manian's office around 11 a. m.

Because of the difficulty in locating the eyewitnesses to view the defendant in the several lineups after the passage of seven years; because of the necessity of checking on the defendant's alibi; and because of the lie detector test which the defendant, himself, had requested from the very outset, we conclude that the period of detention in the instant case was not excessive and the purposes for the detention were reasonable.

*Voluntariness of confession.*

Defendant contends that it was error to admit into evidence his statement to Manian because the state failed to meet its constitutional burden of showing that it was voluntarily given and not the result of coercion, beyond a reasonable doubt. *Sharlow v. State* (1970), 47 Wis. 2d 259, 177 N. W. 2d 88. Very recently, in the case of *Lego v. Twomey* (1972), 404 U. S. 477, 92 Sup. Ct. 619, 30 L. Ed. 2d 618, the United States Supreme Court affirmed the Illinois rule that the voluntariness of a confession need only be demonstrated by a mere preponderance of the evidence.

Expressly referring to Wisconsin as among those states which require voluntariness to be proved beyond a rea-

sonable doubt, *Lego, supra,* at page 489, the high court stated:

"Of course, the states are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values that they find at stake."

The trial court specifically found that the statement made in Manian's office was voluntary, beyond a reasonable doubt, and on appeal the state has in no way intimated that this court should now change its long-established rule.

The confession is composed of questions by Assistant District Attorney Manian and answers by the defendant, totalling 17 pages as transcribed by Mary Mullen, a secretary in the district attorney's office. In substance, the defendant stated that on June 1, 1963, he had been drinking heavily and that shortly after 8 p. m. he was in the neighborhood of the Hillside Housing Project looking for the house of a woman he knew named Lorice Armstrong. He further stated that when he found no one at home, he met Portia Bufford and said to her: "Come on, I want you to go somewhere with me." She came with him and they drove down to the end of the Haymarket Square. The defendant stated that after he parked the car, she tried to get out and that they struggled as he tried to kiss her. ". . . [S]he started screaming to go home, . . . and I recall putting my hand over her face to stop her from screaming but evidently I had them around her neck choking her." At this point she passed out. He removed her from his car but accidently dropped her, and she regained consciousness and started to kick and scream again, and, in a panic to keep her quiet, he grabbed something—probably a block—and hit her. It was too dark to see where he hit her. After he hit her, she rolled under the truck. At this time, he was dressed in work clothes—khaki pants and paratrooper boots—

and his hair was long with red streaks in it due to a lack of a treatment in awhile. The defendant then stated that he hit a bunch of parked cars on Sixth Street and that at the time he was driving a '54 black Ford registered in the name of Robert Wallace rather than James.

Whether or not a confession is voluntary and not the result of coercion depends upon the "totality of the circumstances." The test is whether "the totality of the circumstances that preceded the confessions . . . goes beyond the allowable limits," *Fikes v. Alabama* (1957), 352 U. S. 191, 197, 77 Sup. Ct. 281, 1 L. Ed. 2d 246, and this court has consistently applied it. *State v. Hoyt* (1964), 21 Wis. 2d 284, 317, 124 N. W. 2d 47, 128 N. W. 2d 645; *State v. Hunt, supra.*

Whether a confession is voluntary "under all of the circumstances" and therefore in conformance with constitutional standards and safeguards calls for a very careful balancing of the personal characteristics of the confessor with the pressures to which he was subjected in order to induce his statements. Stated another way:

"If a confession is to be the product of the free and unconstrained will of the defendant it is important that under the totality of circumstances in which the confession is obtained, the defendant is not the victim of a conspicuously unequal confrontation in which the pressures brought to bear on him by representatives of the state exceed the defendant's ability to resist." *State v. Hoyt, supra,* at page 308.

In *State v. Schneidewind* (1970), 47 Wis. 2d 110, 117, 176 N. W. 2d 303, this court has set forth the relevant factors which must be considered on both sides of the balance. Bearing on the personal characteristics of the confessor, consideration should be given to his age, *Haley v. Ohio* (1948), 332 U. S. 596, 68 Sup. Ct. 302, 92 L. Ed. 224; *Gallegos v. Colorado* (1962), 370 U. S. 49, 82 Sup. Ct. 1209, 8 L. Ed. 2d 325; his education and intelligence, *Townsend v. Sain* (1963), 372 U. S. 293, 83 Sup. Ct. 745,

9 L. Ed. 2d 770; his physical and emotional condition at the time of the interrogation, *Greenwald v. Wisconsin* (1968), 390 U. S. 519, 88 Sup. Ct. 1152, 20 L. Ed. 2d 77; and his prior experience with the police, *Lynumn v. Illinois* (1963), 372 U. S. 528, 83 Sup. Ct. 917, 9 L. Ed. 2d 922; *Reck v. Pate* (1961), 367 U. S. 433, 81 Sup. Ct. 1541, 6 L. Ed. 2d 948.

Those factors which, on the other hand, must be looked at to determine the amount of police pressure used to induce the confession include the length of interrogation, *Spano v. New York* (1959), 360 U. S. 315, 79 Sup. Ct. 1202, 3 L. Ed. 2d 1265, and delay in arraignment, *Reck v. Pate, supra,* and *Crooker v. California* (1958), 357 U. S. 433, 78 Sup. Ct. 1287, 2 L. Ed. 2d 1448; the general conditions under which the interrogation took place, *Fay v. Noia* (1963), 372 U. S. 391, 83 Sup. Ct. 822, 9 L. Ed. 2d 837; any extreme psychological or physical pressure, *Brown v. Mississippi* (1936), 297 U. S. 278, 56 Sup. Ct. 461, 80 L. Ed. 682; *Chambers v. Florida* (1940), 309 U. S. 227, 60 Sup. Ct. 472, 84 L. Ed. 716, possible inducements, methods and stratagems which were used by the police, *Lynumn v. Illinois, supra;* whether the confessor was unlawfully arrested, *Culombe v. Connecticut* (1961), 367 U. S. 568, 81 Sup. Ct. 1860, 6 L. Ed. 2d 1037; and, of course, whether the confessor was apprised of his right to counsel and his privilege against self-incrimination. *Haynes v. Washington* (1963), 373 U. S. 503, 83 Sup. Ct. 1336, 10 L. Ed. 2d 513.

The trial court found that at the time of his arrest, the defendant was forty-four years of age and despite the fact that he had only a fourth grade education, he was intelligent and quick-witted and that he had had very limited exposure to police work since the record was devoid of any evidence indicating that he had ever been convicted of a crime. While under arrest, both in Denver and Milwaukee, the defendant was repeatedly advised of his right to counsel and his right not to incriminate

himself and this advice carried through to Monday afternoon when he made his statement. The record discloses that at no time was the defendant physically coerced or touched by anyone. In fact, the defendant admitted the Milwaukee police officers were courteous in their treatment of him.

The defendant contends that his confession was involuntary under the totality of the circumstances because of a combination of his lengthy detention; various cruel conditions to which he was subjected; and certain abusive stratagems employed by the police.

Defendant's detention was long by this court's standards. However, there was a satisfactory explanation. During the detention period, the police made what the trial court described as a "real attempt" to find alibi witnesses named by the defendant, but they were unable to find them until Sunday afternoon; they were brought to the jail and had an opportunity to speak to the defendant; the trial court further found that the defendant requested a polygraph test on Monday morning, the completion of which took three hours. Witnesses who had been playing with Portia Bufford and had observed her leave the area in the company of a man had to be located after the passage of seven years. Applying the totality-of-circumstances test to the detention period, the time lapse is not unreasonable.

As a second factor indicating that his confession was involuntary, defendant points out the "abominable jail conditions" allegedly suffered by the defendant during his confinement in the city jail and which contributed to his not sleeping well. Defendant's cell was about four by eight feet with a wooden plank to sleep on, and a face towel and toilet stool. Apparently, there was a leak in the pipe and when someone up or down the line would flush the toilet, water would leak onto the floor of his cell. The trial court did find that defendant's cell was uncomfortable. The jury viewed the jail cell during the

trial; the only apparent defect at that time being a small hole under the toilet bowl in the wall adjoining the next cell.

The cases cited by defendant with respect to deprivation of sleep as being a factor going to the voluntariness question are cases which involved deprivation of sleep because of nighttime questioning by interrogating officers. In *State v. Hoyt, supra,* the defendant gave her confession in the early morning hours only after having been continuously interrogated up to that time without sleep. No claim is made here that anything of that nature took place with respect to this defendant.

As a third factor bearing on the involuntariness of his confession, defendant points out several alleged police stratagems which he says were unfairly employed against him. The defendant testified that at the conclusion of the Saturday night lineup, Captain Russ told him that he had been identified and that now he was going to prison. Essentially the same thing was told him on Sunday night when Deborah Ivy had in fact identified him in the lineup. The defendant's complaint that the subsequent ruling of the trial court that Deborah Ivy's identification was untrustworthy and inadmissible does not alter the fact that Deborah Ivy did state to the police that defendant was the man involved. We find no merit to the claim that the police were guilty of any false statement to the defendant with regard to his identification.

The defendant testified that throughout his various interrogations certain "gruesome" photographs of the corpse of Portia Bufford were shown to him repeatedly and that officers would "deal them off like cards," asking him why he did it. Defendant is referring to the three pictures which are here a part of the record. The first is a black and white photo of the victim's bloody body as it lay in the gutter under the truck in the exact position when the police found it. Two other photo-

graphs, in color, show Portia Bufford on a table in the morgue, with emphasis placed on depicting the several very deep cuts and numerous abrasions on the left side of her head and upper body. Defendant contends that this was just another more subtle form of corpse identification which this court condemned in *Bradley v. State* (1967), 36 Wis. 2d 345, 153 N. W. 2d 38, 155 N. W. 2d 564 and reversed upon in *McKinley v. State* (1967), 37 Wis. 2d 26, 154 N. W. 2d 344. In these cases, the defendant was taken to the morgue upon the premise that the police wanted an identification when the record disclosed there was no need for one. In condemning such practices, this court stated in *McKinley v. State, supra,* at page 35:

"If our society is so civilized as to demand that a suspect be warned of his constitutional rights before questioning, and to extend to a suspect the right to remain silent during questioning and to have an attorney present, it must eschew the barbarism of 'corpse identification' during the process of interrogation."

The sudden and all-consuming realization of actually being present in the morgue and being confronted with a dead loved one cannot be likened to the process here employed by the police. However, while we find the use of these photographs did not render the confession involuntary, we caution the law enforcement officers against the use of gruesome photographs as a substitute for morgue identification of victims of criminal acts.

*Jury's view of photographs*
The defendant's final contention is that the trial court erred in allowing the jury to examine the two color photographs of Portia Bufford taken of her in the morgue and that this error was prejudicial. Over the objection of defense counsel, the trial court permitted the photographs to be passed among the jury at the conclusion of the pathologist's testimony, stating that that would be

the only opportunity they would have to see them. The general rule concerning a view of photographs by the jury is stated in *Gustin v. Johannes* (1967), 36 Wis. 2d 195, 204, 153 N. W. 2d 70:

"In *Neuenfeldt v. State* this court said:

" '. . . It is discretionary with the trial court to admit photographs to aid the jury in securing a clear idea of a material situation when the photographs better show that situation than does the testimony of the witnesses.'

"But where photographs are not substantially necessary or instructive to show material facts or conditions, and are of such a character as to arouse sympathy or indignation, or divert the minds of the jury to improper or irrelevant considerations, they should be excluded."

During the course of his testimony, the pathologist, Dr. Van Hecke, testified about the various deep cuts and numerous abrasions on the victim's head and chest, and in so doing, he held the photographs. The only material fact which the pictures related to was the number of times the victim had been struck. Dr. Van Hecke testified that although one blow of a concrete brick of this type present at trial and contended to be the murder weapon, could have caused the death, one blow could not have accounted for the numerous other cuts and abrasions. Since the jury was faced with a substantial question as to whether the defendant's conduct as described by him in his confession amounted to first- or second-degree murder, the jury should be allowed to see the photographs to determine how many times the victim actually was struck. Under this theory, the trial court did not abuse its discretion.

We conclude that the police had probable cause to arrest the defendant, that the period of detention of defendant before being taken before a magistrate was not unreasonable under the circumstances, that the defendant's confession was freely and voluntarily given and properly admitted into evidence.

*By the Court.*—Judgment and order affirmed.