HEMAUER, Plaintiff in error, v. STATE, Defendant in error.

*No. State 213. Argued May 8, 1974.—Decided June 4, 1974.*
(Also reported in 218 N. W. 2d 342.)

64

For the plaintiff in error there was a brief and oral argument by *Gerald P. Boyle* of Milwaukee.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

CONNOR T. HANSEN, J. The defendant does not dispute the facts of the crimes. On Saturday afternoon, October 12, 1968, the crimes of abduction, rape and attempted murder were committed against B. L. S., a female, then fifteen years of age (hereinafter B. L. S.). B. L. S. testified that she was shopping at Capitol Court Shopping Center when she saw a parked car with the hood up and a man standing beside it. When she passed the car, the man called to her and asked her if she would help him start it by getting into the driver's seat and turning the ignition while he worked under the hood. She got into the car and had attempted to start it several times when he closed the hood and got into the car on the driver's side. B. L. S. said that she wanted to leave, but he pulled out a gun and forced her to get down on the floor on the passenger side of the front seat. Her assailant then drove her to a parking lot behind a Moreway department store located at 101st and West Appleton Avenue. The drive took ten to fifteen minutes. After they arrived, her assailant forced her to walk through a field, over some railroad tracks, through a wooded area to an area with tall bushes and grass. She was then forced to remove her pants and panties and was raped. Subsequently, her hands were tied behind her back with some twine and she was forced to lie on her stomach. She was stabbed 20 to 30 times in her upper back and pulled up by her shoulders and stabbed in the upper chest 15 to 17 times. Her assailant then put his hand over her mouth and nose in an attempt to suffocate her. When he released her, she went limp and pretended she was dead.

He then cut the rope and left her. When she heard his car start and drive away she put her clothes back on and ran to Appleton Avenue where she obtained assistance of some boys who went to the nearby Moreway store and called an ambulance for her.

Defendant's position at trial and on this appeal is that he was not the victim's assailant.

On August 5, 1971, the victim picked the defendant's photograph out of a group of four photos shown to her by police investigators. She had previously viewed hundreds of photos of potential suspects. She had described her assailant as wearing a light short-sleeve sport shirt, green work pants and light brown or tan work boots, and being approximately forty-five years old, and wearing black horn-rimmed glasses. When she picked out the defendant's photograph on August 5, 1971, she told police that he could very well be the man but she would have to see him in person. She did not positively identify the defendant at that time.

Defendant was asked by Milwaukee police to come to the police administration building at approximately 1:30 p. m. Detective Douglas Zellmer informed him of his rights and at about 2 p. m. told him he was under arrest. He voluntarily answered questions that afternoon and appeared in a lineup at 7 p. m. B. L. S. picked him out of this lineup but asked him to put on a pair of glasses before she would make a positive identification. Defendant put on the glasses and also agreed to permit B. L. S. to look at him in the hall. She examined the defendant more closely in the corridor for several minutes and then indicated that she was sure the defendant was her assailant.

The defendant was questioned further that evening and was consistently reminded of his constitutional rights. At approximately 10 p. m. he asked to call his attorney. His request was granted. There is testimony

to the effect that his attorney told the defendant to make no statement and he, or someone in his place, would be down to see him in the morning. Defendant claims that he divulged the contents of this conversation to the police officers present, that he told them his attorney would be down in the morning and that he was not to answer any questions. Defendant was questioned intermittently during the night and made some very incriminating statements the next morning just before his attorney came to the station. Other facts will be subsequently detailed.

*Issues.*

This appeal presents the following issues:

1. Was the lineup in which the victim identified the defendant conducted according to constitutional standards?

2. Was it error to admit the incriminating statement in evidence?

3. Was it error to exclude testimony of defendant's offer to take a polygraph test?

4. Was the evidence sufficient to sustain the conviction?

*Lineup.*

The defendant argues, amongst other things, that the lineup in which he appeared at 7 p. m. was not conducted in a fair and reasonable manner.

In *Wright v. State* (1970), 46 Wis. 2d 75, 86, 175 N. W. 2d 646, the issue of an unfair and suggestive lineup was discussed and this court stated:

". . . The test of the fairness of a lineup has been stated as follows: 'However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of circumstances surrounding it . . . .' The 'totality of circumstances' reference is a reminder

that there can be an infinite variety of differing situations involved in the conduct of a particular lineup. The police authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. . . . What is required is the attempt to conduct a fair lineup, taking all steps reasonable under the 'totality of circumstances' to secure such result."

Color photographs of the challenged lineup were introduced at trial and shown to the jury. They appear in the record and upon examination of those exhibits it is clear that this lineup was fair. The defendant stood in the lineup with four other police officers. All of the participants wore street clothes with number one also wearing a sport jacket. All participants had reasonably short haircuts. They were all of similar build. There was a discrepancy between the defendant's age (forty-eight) and the ages of participants two (thirty-two), four (thirty) and five (thirty-three). However, while the ages of these three younger participants might by themselves seem to set them apart from the defendant, an examination of the photographs demonstrates that such is not the case. This lineup was not unnecessarily suggestive, and in our opinion constitutionally antiseptic.

*Incriminating statement.*

Detective Kenneth Darton testified at trial that he first met and spoke with the defendant at 8:40 a. m. on August 6, 1971, at the detective bureau. The defendant does not dispute that. Darton fully advised him at that time of his constitutional rights, including his right to remain silent and to have an attorney present if he wished. Darton and the defendant spoke about a variety of subjects from 8:40 a. m. until 9:50 a. m., including hunting, fishing and this crime. Darton spoke alone with the defendant until his attorney arrived, whereupon they

spoke for perhaps five minutes more and the interrogation ceased upon the advice of defense counsel.

Darton extensively detailed his interview with the defendant. Darton testified that during this interview defendant stated, ". . . [H]e probably raped B. L. S. but cannot remember. He suggested that a Psychiatrist could probably help him recall facts regarding the aforementioned offense, . . ."

Defendant testified that he had freely and voluntarily talked to Darton; that he was not forced to answer any questions; and that he was not mistreated in any way and was offered coffee during the interview. He also admitted the statements attributed to him and further testified that on occasions when he drank heavily he did not remember exactly what transpired. ". . . [A]t times I didn't remember getting home. . . ." The defendant testified that when asked about this offense, ". . . I voluntarily said, 'Anything is possible.' I don't know, I didn't do this thing in my mind, I didn't do it, I know I didn't do it. Anything is possible. That is about the way I answered the question to Mr. Darton."

After a *Goodchild* hearing, the trial court admitted the foregoing inculpatory statement of the defendant, made to Detective Darton, in evidence. On this appeal, defendant argues this inculpatory statement should not have been admitted into evidence for two reasons: First, the police should not have questioned the defendant after he had telephoned an attorney and been instructed by his attorney not to say anything further; and second, that the defendant was held in custody for an exorbitant period of time before he made this statement.

At the *Goodchild* hearing, which was held on the admissibility of defendant's incriminating statement, the defendant testified that he told Darton that his attorney would be there shortly and that he should wait for him. Defendant testified that Darton said it wasn't necessary

for his attorney to be there at that time. Darton, on the other hand, testified that prior to questioning he fully advised the defendant of his right to counsel and asked him if he wished to consult an attorney, but the defendant said no. Detective Darton testified that he had not met the defendant until 8:40 a. m. on August 6, 1971, when he interrogated him. Darton said he could not remember whether anyone in the police department had advised him that the defendant was represented by counsel. Darton also denied that after he had informed the defendant of his rights, defendant had said his attorney was to be there before any questioning. Darton testified that he did not know that the defendant had contacted an attorney before he questioned him. In resolving this issue of credibility, the trial court, after the very extensive *Goodchild* hearing held:

"I find here that from the evidence which I consider credible that there is [sic] no communication made by this defendant to any Police Personnel that he had talked to an attorney at any time prior to the main interrogation nor that he had been advised by such attorney not to answer any questions until attorney Ryan arrived on August 6th when Ryan told the defendant in the presence of the Officers that he shouldn't talk any longer with the Police."

The trial court found that the defendant was a mature man, a high school graduate, and that he thoroughly understood all of his constitutional rights. He knew that he had a right to speak or refuse to speak with Darton and made his statement without psychological or physical pressure. Upon these findings, the trial court held the defendant's statement to be voluntary and admissible. We agree with this determination of the trial court.

This court has held that, unless contrary to the great weight and clear preponderance of the evidence, the findings of voluntariness made pursuant to a *Goodchild*

hearing will be sustained on appeal. *State v. Estrada* (1974), 63 Wis. 2d 476, 217 N. W. 2d 359; *Priddy v. State* (1972), 55 Wis. 2d 312, 314, 198 N. W. 2d 624; *McClellan v. State* (1972), 53 Wis. 2d 724, 728, 193 N. W. 2d 711; *Sharlow v. State* (1970), 47 Wis. 2d 259, 177 N. W. 2d 88.

Defendant's second argument is that the statement was inadmissible because the defendant was held in custody during an exorbitant period of time prior to his making the statement.

In *State v. Wallace* (1973), 59 Wis. 2d 66, 75, 207 N. W. 2d 855, this court explained:

". . . While the length of detention is a very important consideration in determining whether statements or a confession were voluntarily made, *State v. Herrington* (1969), 41 Wis. 2d 757, 773, 165 N. W. 2d 120, the threshold question is whether the period of detention was unreasonably long in the first instance. Statements made during a period of unreasonable detainment will be excluded whether voluntary or involuntary."

Sec. 970.01, Stats., provides as follows:

"**Initial appearance before a judge.** (1) When any person is arrested he shall be taken within a reasonable time before a judge in the county in which the offense was alleged to have been committed.

"(2) When a person is arrested without a warrant and brought before a judge, a complaint shall be filed forthwith."

The defendant voluntarily came to the police administration building at approximately 1:30 p. m. on August 6, 1971, for questioning. He was advised at 2 p. m. that he was under arrest. B. L. S. had tentatively identified him from a group of pictures earlier that day at her place of employment but she wanted to see him in person in order to make a positive identification. The defendant was questioned during the course of the afternoon intermittently for various periods of time. Defendant testified

he was questioned from approximately 1:30 until 3:45 p. m. by several police officers alone and in groups and from 4 p. m. until the lineup was held. Defendant testified that he was offered food several times and coffee, but he could not eat. The lineup was held at approximately 7 p. m., and the defendant permitted B. L. S. to see him in the corridor with glasses on. The lineup lasted for about thirty minutes. It was at this time the defendant was positively identified by the victim. He was periodically questioned until he phoned his attorney at about 10 p. m. He was again questioned from about 11 p. m. until 12 midnight. He was not able to sleep and was again questioned at about 2:30 a. m. He complained of chest pains and was taken to the hospital at about 3:45 a. m. for medication to calm him down. He was back in his cell at 5:45 a. m. He was awakened at 7:15 a. m. and spoke with Darton at 8:40 a. m. At first defendant claimed no one spoke with him between 7:15 and 8:40 a. m. but subsequently claimed that he was questioned at 6:45 a. m. for an unknown period of time by an unknown officer.

There are some inconsistencies in the testimony with regard to how long the defendant was questioned for various periods of time, it is apparent that he was periodically questioned after the lineup was held and after he phoned his attorney. However, he was consistently made aware of his right to refuse to answer questions and does not dispute this fact. In fact, he testified, "Yes, I felt as though I had nothing to lose, I volunteered freely to speak with the boys." He was given several opportunities to rest and sleep but said that he could not sleep. He was also offered food and coffee.

The trial court held at the conclusion of an extensive *Goodchild* hearing on this issue that no coercive measures were used against the defendant and that the period of detention was not excessive. The defendant was under

arrest at 2 p. m., but it was not until 7 p. m. when B. L. S. made her positive identification. In *State v. Estrada, supra,* the issue of unreasonable detention was also considered and this court held:

". . . The law is well settled that any statement obtained from a defendant during a period of *unreasonable* detention is inadmissible in evidence. The determination of whether the detention was unreasonable rests on the facts of the individual case." (p. 490)

The issue of unreasonable detention was also raised in the following cases:

*State v. Carter* (1966), 33 Wis. 2d 80, 146 N. W. 2d 466, one and one-half hour period of detention on its face not unreasonable; *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120, during a ten-hour detention defendant led police to where the murder weapon was and the scene of three crimes; *Wright v. State* (1970), 46 Wis. 2d 75, 175 N. W. 2d 646, delay to await the outcome of a lineup; *State v. Hunt* (1972), 53 Wis. 2d 734, 193 N. W. 2d 858, although questioned for eight hours on first day when not under detention and time running from 8:30 a. m. to 11:30 p. m. of the second day in which time there was not enough evidence to charge him with a crime; *Massen v. State* (1969), 41 Wis. 2d 245, 163 N. W. 2d 616, arrested late in the evening and taken before magistrate the next day; *State v. Shoffner* (1966), 31 Wis. 2d 412, 143 N. W. 2d 458, defendant's readiness to give information concerning a large number of offenses affected length in which police could reasonably investigate; *Zdiarstek v. State* (1972), 53 Wis. 2d 420, 192 N. W. 2d 833, unreasonableness of detention from 10 p. m. to 4:15 p. m. of next day moot because confession already adjudged inadmissible under *Miranda; Quinn v. State* (1971), 50 Wis. 2d 101, 183 N. W. 2d 64, detention of approximately one day not unreasonable

where within the first hour defendant confessed to eight armed robberies including the one involved, and thereby necessitating police investigation of all eight; *Pinczkowski v. State* (1971), 51 Wis. 2d 249, 186 N. W. 2d 203, nothing in record to demonstrate that defendant was not expeditiously brought before magistrate where it appeared that the arrest was on the same day as the confession; *Krueger v. State* (1972), 53 Wis. 2d 345, 192 N. W. 2d 880, fourteen-hour detention to obtain "sew-up" confession alright where defendant on appeal did not challenge the delay as inordinate or the detention as illegal; and *Liphford v. State* (1969), 43 Wis. 2d 367, 168 N. W. 2d 549, nine and one-half hour detention where record established that defendant was taken before magistrate approximately one hour after court opened in morning; and *State v. Wallace* (1973), 59 Wis. 2d 66, 207 N. W. 2d 855, detention over Memorial weekend where record indicated delay necessary to check an alibi, give requested lie detector and fact of seven-year lapse between crime and arrest.

The defendant was positively identified at 7:30 p. m. on August 6th, the inculpatory statement was made shortly after 8:40 a. m. on August 7th, and the defendant was arraigned later the same morning. The trial court did not err in holding that the delay in this case was not unreasonable.

*Exclusion of defendant's offer to take a polygraph test.*

The defendant contends his incriminating statement concerning his participation in these offenses that "[a]nything is possible" was immediately followed by his offer to take a lie detector test to prove that he did not do it. Therefore, argues the defendant, that portion of his remarks was improperly excluded when his incrimi-

nating statement was presented to the jury. This argument is primarily based upon some condensed notes Darton made of his interview with the defendant. However, the record speaks for itself and reflects that the defendant did not simultaneously make the two utterances. In fact the record reflects that the defendant said he would take a polygraph test in response to a question from Darton after his attorney had arrived.

In *State v. Perlin* (1955), 268 Wis. 529, 537, 68 N. W. 2d 32, the trial court had denied defendant's request for a lie detector test and this court said, ". . . results of such a test are not evidence admissible upon trial. . . ." [1] The trial court refused to permit reference to this self-serving offer to take the test because the results of the test would have been inadmissible, citing *State v. Baker* (1962), 16 Wis. 2d 364, 114 N. W. 2d 426.

The trial court was fully aware of the defense counsel's argument that he wanted to include defendant's assent to take the test only for the purpose of tempering his earlier incriminating statement.

In *State v. Baker, supra,* the defendant was asked if he had made himself available for a lie detector test and the trial court sustained an objection to the question. In reviewing the trial court's action of sustaining the objection, this court held as follows:

"We consider the question was improper. The results of such a test are inadmissible, as the state concedes. *State v. Bohner* (1933), 210 Wis. 651, 246 N. W. 314; *LeFevre v. State* (1943), 242 Wis. 416, 8 N. W. (2d) 288; *State v. Perlin* (1955), 268 Wis. 529, 68 N. W. (2d) 32. Had a test been made, evidence of the result would be incompetent. Therefore reference to such a test, as indicated in counsel's question, could have no proper pur-

---

[1] *State v. Stanislawski* (1974), 62 Wis. 2d 730, 216 N. W. 2d 8, is not applicable. First, because it is prospective in its application; and, second, the parties did not comply with the conditions and stipulations therein required.

pose and could be asked only for prejudicial effect. . . ." *State v. Baker, supra,* p. 368.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 294, 149 N. W. 2d 557, this court cited with approval Rule 303 of the American Law Institute Model Code of Evidence, as follows:

". . . [W]e think the answer lies in the adoption of Rule 303 of the American Law Institute Model Code of Evidence. This rule balances relevancy against prejudice and provides:

" 'Rule 303. DISCRETION OF JUDGE TO EXCLUDE ADMISSIBLE EVIDENCE.

" '(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will

" '(a) necessitate undue consumption of time, or

" '(b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury, or

" '(c) unfairly surprise a party who has not had reasonable ground to anticipate that such evidence would be offered.' "

In *State v. Driscoll* (1972), 53 Wis. 2d 699, 708, 193 N. W. 2d 851, it was explained:

"Rule 303 of the Model Code is not restricted to certain types of evidence but applies to any evidence when the judge in his discretion finds its probative value is outweighed by the risk its admission will have on the fairness of the trial. . . ."

Thus, the trial court did not err in refusing to admit this evidence.

*Sufficiency of evidence.*

In *Bowden v. State* (1973), 57 Wis. 2d 494, 495, 204 N. W. 2d 464, this court held:

". . . The sole issue is whether there is sufficient credible evidence to sustain defendant's conviction of second-degree murder.

"The standard of review this court applies to the question of the sufficiency of the evidence is set forth in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725. It is there stated:

" 'Several rules applied in appellate review of the sufficiency of the evidence in criminal cases have been stated so frequently in our late cases that they need no citation of authority to support them. The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. Our review of the record in response to a challenge to the sufficiency of the evidence is so limited by these rules.' "

B. L. S. positively identified the defendant as her assailant. This uncorroborated testimony alone would have been sufficient. *Lemerond v. State* (1969), 44 Wis. 2d 158, 162, 170 N. W. 2d 700. However, there was much more. B. L. S. had previously identified her assailant's car as an older two-toned automobile, cream colored and white. On August 11, 1971, B. L. S. was taken to Menzl's car lot where vehicles are apparently taken which have been towed off the city streets. She testified that she picked the defendant's car out of some 230 cars on that lot. She identified the defendant's 1960 automo-

bile as the same car which he had used when he abducted her. She had looked at almost all of the cars in the lot before she recognized the defendant's 1960 Mercury. She recalled it because the hood opened from the windshield side, and the ignition was on the left side of the steering wheel, and the floor mat extending across the front was brown.

Mary Ann Starick was shopping at Capitol Court on the day of the crime with her son, who was eight and one-half years old, and her baby daughter. She testified that on the day in question she had noticed the man with the apparent car trouble at the shopping center. She identified the defendant at trial, although she had previously misidentified him at a second lineup. At trial, she testified this misidentification was deliberate because of fear. She had heard a radio newscast on the evening of October 12, 1968, that indicated the man who had car trouble at the shopping center was being sought by the police. She phoned the police, and described the man the next day when police interviewed her. She also later identified the defendant's car from amongst many cars at Menzl's lot.

The defendant presented an alibi in his defense. He presented an alibi witness who said they were duck hunting together on October 12, 1968, and that defendant left on business at about 3:30 p. m. Two tenants who rented an apartment from the defendant testified that they had seen him in Fond du Lac on October 12, 1968, between 4 and 5 p. m., and that he was driving his 1967 Pontiac at the time. Defendant also attempted to discount the victim's identification of his automobile by the testimony of his former wife, who said that the 1960 Mercury was in Stockbridge, Wisconsin, on October 12, 1968. She said that she had possession of the car from April of 1968, and that the defendant had used it on only one occasion.

We conclude that there was sufficiently credible evidence to sustain the jury's verdict. Much of the evidence is in direct dispute and, therefore, becomes a question of credibility for the jury. On appeal, ". . . '[t]he test is not whether this court or any of the members thereof are convinced beyond a reasonable doubt, . . .'" *Bowden v. State, supra,* page 495. The credibility of the witnesses is properly determined by the jury and that has been done in this case.

*By the Court.*—Judgment affirmed.