McADOO, Plaintiff in error, v. STATE, Defendant in error.

*No. State 107. Argued October 30, 1974.—Decided November 26, 1974.*

(Also reported in 223 N. W. 2d 521.)

598

For the plaintiff in error there was a brief by *Patrick T. McMahon* and *McMahon & Moroney,* attorneys, and *Dennis P. Moroney* of counsel, all of Milwaukee, and oral argument by *Patrick T. McMahon.*

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

BEILFUSS, J. The defendant asserts (1) that his statements admitted into evidence were involuntary, (2) that he was detained an unreasonable length of time before being charged and brought before a magistrate, and (3) that evidence is not sufficient to sustain the conviction. He further asserts that in any event this court should award him a new trial in the interest of justice under sec. 251.09, Stats.

On December 16, 1972, at 9:45 a. m., the body of Melvin Roberts, the proprietor of the Wig-Wam Tailors, was found in his shop at 2878 North 27th Street, Milwaukee. The body, which was lying behind a counter, was discovered by a truck driver who had come to make a delivery. At the time of his discovery, the door to the shop was unlocked and the lights were on. He testified that he had been there the day before in an attempt to make the delivery, but although the lights were on and the door was unlocked, no one seemed to be around or answered his calls. However, he did not look behind the counter on that day. The victim was lying on top of three pairs of trousers, which all had bullet holes in them, and a fourth pair of trousers was lying next to the body. The victim's apparel included a headband and two belts, one of which was unfastened. There was testimony by four witnesses that the victim kept his money in a green wallet or pouch which was attached by a chain to his belt or belt loop. No wallet or pouch was found on the body. The cash register was open and contained about fifty cents in pennies. The cause of death was a

gunshot wound to the heart. The victim was shot once in the chest, the bullet passing through the heart and out the victim's back. An autopsy was performed at 3:40 p. m. on December 16, 1972, and the most likely time of death was estimated to be thirty to thirty-six hours prior thereto. Found on the premises were one .38-caliber bullet and eight bullet fragments, indicating that a second bullet, also a .38, had shattered upon striking a hard object.

Several days prior to the discovery of the body, Christine Colby, who had known the victim quite well and whose brother was a friend of the defendant, met the defendant and two other boys at the corner of 27th and Center Streets in Milwaukee. While they were conversing, the victim, Melvin Roberts, was seen walking on the other side of the street. The defendant stated, "There's that guy that owns the cleaners." He further stated he liked the fur coat that the victim was wearing and that he intended to "rip it off" (steal it). Later that evening Christine Colby again saw the defendant and two other boys in a laundromat on the corner of 27th and Burleigh Streets. The defendant again said he was "going to get that coat." One of the other boys said that the victim carried a lot of money. The defendant acknowledged that fact, said he wanted the coat and some money, and was going to "blow him away" (shoot Melvin Roberts). When Christine Colby expressed disbelief, the defendant stated, "You'll believe it when you read it in the paper." The defendant also stated that he had seen the lights on in the store and knew that the victim worked at night.

The defendant was arrested on December 19, 1972, at 9:45 a. m., by Milwaukee Police Detective Roosevelt Harrell. At the time of the arrest, Harrell was aware of the defendant's statements to Christine Colby and was also aware of a commitment order for defendant to the Milwaukee Sheriff's Department. Harrell placed the defendant in a squad car and told the officers in it not to talk to the defendant. Harrell followed in another car.

The vehicles proceeded directly to the police administration building where the defendant was placed in an interrogation room.

The evidence as to what occurred from this point on is in conflict.

Detective Harrell testified that in the interrogation room, in the presence of Detective Barth and Lieutenant Bottoni, he advised the defendant of his constitutional rights and then asked the other two officers to leave while he interrogated the witness alone. The defendant declined an attorney and agreed to answer any questions. The interrogation began at about 10:45 a. m. Harrell testified that during the course of the interrogation neither he nor anyone else laid hands on the defendant, displayed any weapons or coerced him in any way. In the course of the interrogation, the defendant gave a statement to Harrell in which he admitted that on Thursday, December 14, 1972, he entered the shop to rob the proprietor. He had planned to do so on an earlier date but the place had been closed. As he entered the shop he pulled up his collar and put his hands in his coat pockets. He saw no one in the shop so went right to the cash register and began removing some coins when the victim entered and said something to him. The victim was wearing a red headband and carrying three pair of trousers. Defendant put his hand back in his pocket, told the victim this was a robbery and demanded all his money. The victim reached behind a counter and pulled out a .38 revolver. The defendant grabbed at the victim, a struggle occurred and the gun fired twice. The victim fell to the floor and defendant grabbed the gun and ran out of the shop, eventually throwing the gun away on some railroad tracks.

The interrogation took about forty-five minutes. Harrell then called Officers Barth and Bottoni into the room, readvised the defendant of his rights and asked him to repeat the statement for the other officers. The defendant made a virtually identical statement, except that he

said he sold the gun. He then retracted the statement, however, saying he was kidding and had only made the statement because Detective Harrell had told him he could be out by four o'clock if he did. When Officers Barth and Bottoni left, the defendant readmitted the crime to Harrell alone, after again being advised of his constitutional rights. The defendant agreed to repeat his statement to other officers, and in fact did so, but this time stated that he had hid the gun behind a toilet in a restaurant. Again, however, the defendant retracted his statement, saying he only made it so he could be out by three o'clock. At this point Harrell began to doubt the defendant's sanity and inquired concerning it. The defendant again repeated the story for Harrell alone. At this point (2:30 p. m.) Harrell gave up and went to file his report. Officers Barth and Bottoni took charge of defendant, allowing him to make four phone calls, and then questioning him for twenty minutes, during the course of which the defendant again admitted the crime but then retracted his admission. The defendant was then processed in the police station from 3 to 5:45 p. m. In the course of the day the defendant had been given breaks for lunch and lavatory use.

The defendant was taken to the Milwaukee District Attorney's office the next morning, December 20th, but was not charged at that time because he requested that he be given a polygraph examination in Madison. About noon the defendant was delivered to the Milwaukee County Sheriff and held on the commitment order. At about 8:15 a. m., the following morning, December 21st, the defendant left with Police Detectives Barth and Paulous for the State Crime Laboratory.

Upon their arrival, Robert L. Anderson, the polygraph examiner, explained to the defendant how the test worked, that he did not have to take the test, that he did not have to answer any given question and that he had the right to an attorney. The defendant agreed to take the test and

discuss the incident. Mr. Anderson then read to defendant a consent sheet explaining defendant's rights, and had the defendant sign it. Finally, Mr. Anderson quizzed the defendant on his rights to make sure they were understood. A first series of tests was conducted in the morning, starting at about 10:45 a. m. A lunch break was taken and a second series of tests began about 2 p. m. At about 2:25 p. m., the defendant indicated that he wished to discontinue the test. Pursuant to this request, the testing equipment was taken off the defendant, turned off and put away, and the defendant was informed that the test was over. The defendant did not indicate that he did not wish to talk to Mr. Anderson, who continued to question the defendant. The defendant freely answered and talked for about forty-five minutes. In the course of the conversation he admitted to Mr. Anderson that at 7:30 p. m., on Thursday, December 14, 1972, he had entered the victim's shop with a friend, Terry Wallace, for the purpose of getting warm. The victim ordered the two out of the shop, referring to them as "black bastards." The two approached the victim who then pulled a gun, a struggle ensued, two shots were fired, and the victim fell to the ground. The defendant grabbed the gun and he and Terry fled the shop, the defendant eventually selling the gun for a "nickel." (A "nickel" is street language for five dollars.)

After making this statement, Detectives Barth and Paulous took the defendant into a separate room at the crime lab, where Detective Barth again advised him of his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694). The defendant then confirmed the statement that he had given to Mr. Anderson, adding only that Terry Wallace got some money from the store before they left. Barth, Paulous and the defendant then went back to Milwaukee, arriving at the police administration building at 5:15 or 5:30 p. m.

Upon arrival, the defendant was taken to an interrogation room, where Detective Kenneth McHenry explained to defendant his *Miranda* rights and then began to question the defendant, who gave McHenry an oral confession and also a written confession. The confession was written on a printed form which contained a provision to the effect that the statement was made voluntarily, without threat or promise and with knowledge of the *Miranda* rights. McHenry went over this provision five times with the defendant to make sure he understood before writing. Defendant started writing at 6 p. m., and finished at 6:45 p. m., tearing up several papers and starting over in the process. The written statement is consistent with that given to Mr. Anderson.

On December 23d the defendant was taken before the Milwaukee District Attorney, at which time he requested and was furnished an attorney.

On December 24th Detective Barth picked up the defendant at the jail and escorted him to the office of the district attorney. In the waiting room, where his parents and attorney were waiting, the defendant gave Detective Harrell a statement consistent with his written confession. Defendant subsequently denied that he was involved at all. Defendant was then charged with second-degree murder and armed robbery.

The defendant's version of what transpired between his arrest and the time he was charged is quite different. He claims that once he was in the interrogation room on December 19th, Detective Harrell told him that if he did not cooperate he would go to prison, otherwise he could be out by 4:30 p. m., that afternoon. He further claims that Harrell told him what to say, threatened to have a witness lie and accuse him, and slapped defendant twice on the face. He was allegedly slapped and threatened before being advised of his rights, and he only confessed to the crime to get out by 4:30 p. m. He claims he was not allowed to make any phone calls until 4 p. m.

With respect to the written statement, the defendant claims that he was told by Detective McHenry that if he did not write it out he would be convicted of first-degree murder, and that defendant wrote out several statements before McHenry would accept one. Defendant further claims that he requested, but was denied, an attorney upon his return from Madison on the 21st. All of these allegations were controverted by the testimony of the various police officers.

After a *Goodchild* hearing *(State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, certiorari denied, 384 U. S. 1017, 86 Sup. Ct. 1941, 16 L. Ed. 2d 1039), the court determined that, beyond a reasonable doubt, all of the defendant's statements were voluntarily made after being informed of and understanding his constitutional rights and, therefore, admissible at trial. By stipulation, the evidence received at the *Goodchild* hearing was to be considered as part of the State's case in chief. At the trial to the court, the defendant was found guilty of third-degree murder—unarmed robbery—and sentenced to an indeterminate term of not less than twenty years.

Inculpatory statements made by an accused are inadmissible in a criminal prosecution against him, even if made after receiving the *Miranda* warnings, unless they were made voluntarily. *State v. Parker* (1972), 55 Wis. 2d 131, 135, 197 N. W. 2d 742; *Roney v. State* (1969), 44 Wis. 2d 522, 533, 171 N. W. 2d 400. Although the state has the burden of proving voluntariness to the trial court beyond a reasonable doubt, the standard on review here is whether the findings of the trial court are contrary to the great weight and clear preponderance of the evidence. *State v. Parker, supra.* Any conflicts in the testimony regarding the circumstances surrounding the confession must be resolved in favor of the trial court's finding. *State v. Schneidewind* (1970), 47 Wis. 2d 110,

116, 176 N. W. 2d 303; *State v. Hoyt* (1963), 21 Wis. 2d 310, 317a, 124 N. W. 2d 47.

The determination as to whether a confession is voluntary, rather than the result of coercion, must be made in light of the "totality of the circumstances." *Brown v. State* (1974), 64 Wis. 2d 581, 585, 219 N. W. 2d 373; *State v. Wallace* (1973), 59 Wis. 2d 66, 207 N. W. 2d 855; *Pontow v. State* (1973), 58 Wis. 2d 135, 205 N. W. 2d 775; *Schneckloth v. Bustamonte* (1973), 412 U. S. 218, 93 Sup. Ct. 2041, 36 L. Ed. 2d 854; *Fikes v. Alabama* (1957), 352 U. S. 191, 77 Sup. Ct. 281, 1 L. Ed. 2d 246. Whether a statement is voluntary under all the circumstances ". . . calls for a very careful balancing of the personal characteristics of the confessor with the pressures to which he was subjected in order to induce his statements." *State v. Wallace, supra,* page 81; *Brown v. State, supra,* page 586.

". . . Bearing on the personal characteristics of the confessor, consideration should be given to his age. . . ; his education and intelligence . . . ; his physical and emotional condition at the time of the interrogation. . . ; and his prior experience with the police . . . .

"Those factors which, on the other hand, must be looked at to determine the amount of police pressure used to induce the confession include the length of interrogation . . . and delay in arraignment. . . ; the general conditions under which the interrogation took place. . . ; any extreme psychological or physical pressure. . . ; possible inducements, methods and stratagems which were used by the police. . . ; where the confessor was unlawfully arrested. . . ; and, of course, whether the confessor was apprised of his right to counsel and his privilege against self-incrimination. . . ." *State v. Wallace, supra,* page 82; *Brown v. State, supra,* pages 587, 588.

In this case the defendant was eighteen at the time of his arrest and had an eleventh grade education. He did, however, have prior experience with the police, having been previously arrested and convicted on a charge of

homicide by reckless use of a weapon. As stated in *Brown v. State, supra,* page 588, " '[w]hat is overpowering to a weak mind or a first offender may be ineffectual against an experienced criminal.' " *See also Stein v. New York* (1953), 346 U. S. 156, 185, 73 Sup. Ct. 1077, 97 L. Ed. 1522. With respect to the length of interrogation and delay in arraignment, the record indicates that the defendant was arrested on Tuesday, December 19th, and not charged until Sunday, December 24th. Under other circumstances this delay might well have had a coercive influence. In the present case, however, several factors militate against such a conclusion. The defendant was at all times being held under a valid commitment order, and not merely as a suspect. The delay in charging was primarily attributable to the defendant's request to take a polygraph examination. The defendant, while in custody for a relatively long period of time prior to charging, was not interrogated for an unreasonably long time. On Tuesday, December 19th, the day of his arrest, he was questioned from about 10:45 a. m., to 3 p. m., with breaks for lunch, lavatory use and phone calls. On December 21st the defendant was questioned following the polygraph exam and for about half an hour upon his return to Milwaukee. It is not accurate to say, as defendant does, that once he was arrested the "questioning did not cease until he gave statements which did not contain a retraction or exculpatory ending." With respect to possible inducements, methods and physical pressure, the trial court was entitled to believe the testimony of the police that no such tactics were used.

The defendant claims that his statements to Detective Harrell were made while under the impression that a statement was necessary to obtain a discharge. Officer Harrell testified that during his initial interrogation of the defendant, in response to an inquiry as to whether the defendant would be released that day, Detective Harrell replied that such decision was not for him to

make but was up to the district attorney and the judge. Defendant states in his brief:

". . . no such disclaimer was made by any policeman or by the District Attorney in any subsequent interview. If the disclaimer had in fact been given, why was it not repeated at any other time? Defendant submits, the only reason for not correcting defendant's misunderstanding was to encourage further and more damaging statements."

Whether the disclaimer was in fact made is a question of fact which must be resolved in favor of the trial court's finding of voluntariness. *State v. Schneidewind, supra.* Further, by defendant's own testimony, the disclaimer was in fact repeated to the defendant by another policeman to whom the defendant had made a statement.

The defendant's final contention with respect to this issue relates to the oral and written statements made after the polygraph examination.[1] The defendant characterizes the polygraph test as "the strategy of the law enforcement officers to achieve a better or more believable statement," and argues that since it is—

". . . fundamental that polygraph results are not admissible in evidence, . . .[2] statements made immediately after such an examination and completely different from earlier statements are the direct result of the polygraph and, as such, cannot be considered the voluntary act of defendant."

It should be noted that the polygraph can hardly be considered "a strategy of the police officers," since it was administered to the defendant upon his request. The trial court held that the defendant knew the test was over when he made his confession to the examiner, and that

---

[1] The polygraph operator did not testify as to any of his conclusions as to whether the defendant answered the polygraph questions truthfully or untruthfully.

[2] *But see: State v. Stanislawski* (1974), 62 Wis. 2d 730, 216 N. W. 2d 8.

he was aware of his *Miranda* rights, having had them explained many times before this particular statement was made.

The defendant contends he was unreasonably detained prior to being charged in order to obtain a "sew-up" confession.

Any statement, even if voluntarily given by an accused, will be held inadmissible if made during a period of unreasonably long detention. *State v. Estrada* (1974), 63 Wis. 2d 476, 490, 217 N. W. 2d 359; *State v. Wallace, supra,* page 75; *State v. Hunt* (1972), 53 Wis. 2d 734, 741, 193 N. W. 2d 858. As stated in *Phillips v. State* (1966), 29 Wis. 2d 521, 534, 535, 139 N. W. 2d 41:

". . . the right to interrogate after arrest is limited and must be for the purpose of determining whether to release the suspect or if he has been arrested without a warrant to make a formal complaint. . . . A detention for a period longer than is reasonably necessary for such limited purpose violates due process and renders inadmissible any confession obtained during the unreasonable period of the detention.

". . . While one may be detained by the police and interrogated to secure sufficient evidence to either charge him with a crime or to release him, the police cannot continue to detain an arrested person to 'sew up' the case by obtaining or extracting a confession or culpable statements to support the arrest or the guilt. . . ."

Under the facts of this case we do not believe the delay was unreasonable nor that it had a coercive effect upon the defendant.

From the time he was arrested until he was charged, the defendant was held in custody upon a valid commitment order not in any way related to the crime charged here. At least two days of the five-day interval between the arrest and the charge was due solely to the defendant's request to have a polygraph examination.

The defendant was arrested Tuesday, December 19th, questioned intermittently for about four hours and then

booked at the police station. It was then 5:45 p. m. The following morning he was taken before the district attorney where he requested a polygraph test. Necessary arrangements were made and he was taken to Madison the next day for the test. Two days later the defendant was again taken before the district attorney. At this time the defendant requested an attorney. He was provided one and was brought back the following day, Sunday, December 24th, to be charged.

There is a logical explanation for the delay and he was in custody under an independent commitment. Under these circumstances the delay was not unreasonable nor coercive.

The defendant argues the evidence was not sufficient to prove guilt beyond a reasonable doubt.

The defendant was convicted of third-degree murder—robbery in violation of secs. 940.03, 943.32 (1) (a), Stats.

Sec. 940.03, Stats., provides:

"**Third-degree murder.** Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

Sec. 943.32, Stats., provides in part:

"**Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property."

With respect to questions of sufficiency of the evidence, this court stated in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725:

". . . The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. . . ." *See also: Bowden v. State* (1973), 57 Wis. 2d 494, 495, 204 N. W. 2d 464; *Garrella v. State* (1973), 61 Wis. 2d 351, 353, 212 N. W. 2d 101.

On the day the murder occurred, the defendant stated to Christine Colby in no uncertain terms that he was aware the defendant carried a lot of money, that he knew the victim worked at night, and that he intended to "blow him away." The victim was found without his money pouch, which was usually chained to his belt, and one of his belts was unfastened. The defendant's statements to Detective Harrell indicated that he knew of the circumstances surrounding the death, *i.e.*, that two shots had been fired, that the victim was carrying several pairs of trousers, and that the victim was wearing a headband at the time of his death. The various statements of the defendant, while inconsistent in some respects, were consistent with regard to the actual killing. The trial court specifically found unpersuasive the defendant's claim in his later statements that he had entered the shop to get warm. In light of these facts, we conclude that the trier of fact could have reasonably concluded that the defendant was guilty beyond a reasonable doubt.

Should the Supreme Court grant a new trial in the interest of justice pursuant to sec. 251.09, Stats.?

In order for this court to exercise its discretion under sec. 251.09, Stats., "Such grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried." *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d 283; *State v. Parker, supra,* page 144. In order to entertain such a belief, the court must "at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial." *Lock v. State* (1966), 31 Wis. 2d 110, 118, 142 N. W. 2d 183; *Commodore v. State, supra,* page 383.

A thorough review of the entire record has failed to reveal any error that affected the outcome of the trial, and the request is denied.

*By the Court.*—Judgments affirmed.