GALARZA, Plaintiff in error, v. STATE, Defendant in error.

*No. State 136.  Submitted under sec. (Rule) 251.54 January 7, 1975.*
*—Decided February 4, 1975.*
(Also reported in 225 N. W. 2d 450.)

The cause was submitted for the plaintiff in error on the briefs of *Anthony K. Karpowitz* of the Legal Aid Society of Milwaukee; and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *David J. Becker,* assistant attorney general.

BEILFUSS, J. The sole issue is whether the evidence was sufficient to sustain the verdict and conviction.

Three witnesses testified at the trial—Police Officers Gary Byers and Gordon Watters for the prosecution, and Mrs. Primitivo Galarza, the defendant's wife, for the defense. Officer Byers, a member of the gambling detail of the Milwaukee Police Department vice squad,

testified that on April 16, 1973, he went with several other officers, including Officer Watters, and executed a search warrant at the upper flat at 2511 North Holton Street, Milwaukee. They were directed by the warrant to search for: "Gambling paraphernalia to wit: Bolita bet slips, tally sheets, records, and any money that accompanies same." There is no challenge to the validity of the search warrant.

Upon arriving at the address, which was the defendant's residence, the officers saw the defendant standing on the front porch, after identifying themselves as police officers. Officer Byers read the warrant to defendant. The defendant indicated that he understood what the warrant meant. The defendant's person was searched and he was then asked to unlock the front door. The defendant claimed he did not have a key, and none of the keys found on his person unlocked the door. The officers then forced it open, entered the upper flat, and commenced searching.

The defendant and Officers Byers and Watters first went to the defendant's bedroom where, as the defendant and Byers stood by, Officer Watters searched the closet and under the bed. He then moved to the chest of drawers. Officer Byers asked the defendant whether the chest of drawers was his and the defendant replied that it was. Byers asked which of the drawers were the defendant's and he replied that the two top drawers were his and the bottom was his wife's. Officer Watters then opened the top drawer and Officer Byers immediately saw what he described as a familiar piece of paper. Byers at that point asked the defendant, "Are you saying that everything in this drawer is yours?" The defendant stated that it was and Officer Watters then removed from the drawer an envelope with $80 in it, a notebook pad, and a piece of paper with recorded numbers on it that was tucked inside the envelope containing the money. The defendant was at that point

arrested for commercial gambling. He claimed that the money was for rent for the coming month.

The officers also took from the drawer several envelopes and a rent receipt, which stated: "Rent received April 10, 1973, received from Mr. P. Galarza, $80.00 for rent of North Holton Street; April 10, month ending May 9, 1973; $80; Helen Dapieralla."

In the course of searching the remainder of the premises, another slip of paper with numbers written on it was found under a floral piece on the dining room table.

Officer Gordon Watters, who had been a member of the vice squad for four years, testified that he had investigated and participated in almost every type of gambling, that he had attended FBI seminars and Milwaukee Police Academy seminars on gambling subjects, including Bolita, that he had read about six books on the subject of gambling, that he had corresponded with the Chicago Police Department regarding Bolita and policy, that he had investigated Bolita about 150 times, that he had placed Bolita bets about 25 times, that he had testified in court concerning gambling about 400–500 times, and that he had testified regarding Bolita about 45–50 times.

Bolita, as described by Officer Watters, is a game involving the use of three digit numbers from 000 to 999. An individual wishing to place a bet goes to a "writer," chooses any combination of three numbers and places a bet of from five cents to $30. The writer records the bets on a tally sheet, usually making two copies, and then takes 75 percent of the money and a copy of the tally sheet to a "bank," keeping 25 percent of the bets as his commission. The winning number is determined by reference to the last three digits of the winning number of Loterio De Puerto Rico, a weekly lottery-type drawing in Puerto Rico, the results of which are published weekly in the Puerto Rican newspapers. The Bolita winners receive an amount equal to 500 times the amount

of the bet, less 10 percent additional commission for the "writer." The odds of winning are one of a thousand.

Officer Watters was qualified as an expert and testified in his opinion to a reasonable degree of certainty that both State's Exhibit 1, the piece of paper found in the dresser drawer, and State's Exhibit 3, the piece of paper found on the dining room table, were Bolita tally sheets. He further testified he had seen hundreds of similar tally sheets.

State's Exhibit 1, the piece of paper found inside the flap of the envelope containing the $80, had written on it "4-18-73," which was two days after the seizure. April 18, 1973, was a Wednesday, the announced drawing date for the Loterio De Puerto Rico. The piece of paper also had six columns of numbers, divided by vertical lines into three columns, each containing two vertical rows of numbers. Based on his prior training and experience, Officer Watters testified that the first vertical row of numbers in each of the three columns contained the numbers selected by various players of the Bolita drawing. Each of the corresponding numbers in the second vertical row of each of the three columns represented the amount bet on each number, such amounts varying from fifty cents to $6. The initials "CB" next to one of the numbers indicated that it was a combination bet on that number, meaning that the bettor would win if any combination of the three digits comprising that number was the winner.

The total of all the amounts bet, as recorded on State's Exhibit 1, was $107. The amount contained in the envelope, under the flap of which the piece of paper was found, was $80, twenty-five cents short of 75 percent of $107.

The defendant's wife testified that during the weekend prior to the execution of the search warrant she had entertained a large number of persons in her home. While cleaning the house on Sunday evening, she found

a piece of paper, State's Exhibit 1, in a sofa next to a cushion. Not knowing what it was, but thinking it might be important, she put it in the top dresser drawer where important papers were generally kept. She later found the other paper, State's Exhibit 3, under the table in the dining room and put it under the floral piece. She testified that she forgot to tell her husband about the papers when he returned home Sunday night.

Mrs. Galarza further testified that she put $90 for expenses into an envelope in the top dresser drawer and that the money had come from her wages and social security checks.

This summary of the testimony at trial makes it clear that other than the tally sheets and the $80 and the defendant's possession of these items, there is no direct evidence that the defendant committed the crime charged. However, the jury's reliance on additional circumstantial evidence in no way diminishes the validity of its verdict. As stated in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725:

". . . The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. . . ." *See also: Bailey v. State* (1974), 65 Wis. 2d 331, 353, 222 N. W. 2d 871; *McAdoo v. State* (1974), 65 Wis. 2d 596, 611, 223 N. W. 2d 521.

In *Johnson v. State* (1972), 55 Wis. 2d 144, 148, 197 N. W. 2d 760, this court stated:

". . . Defendant acknowledges that each and every element of a crime may be proved by circumstantial evidence but contends that the evidence must be such as to

exclude every reasonable hypothesis consistent with the defendant's innocence. While this is the standard that must be applied by the trier of fact, it is not the test on appeal. In *State v. Lindsey* (1972), 53 Wis. 2d 759, 768, 193 N. W. 2d 699, this court stated:

" '. . . On appeal, this court is not concerned with the evidence which might support other theories of the crime, it is concerned only with ascertaining whether the trier of fact could, acting reasonably, exclude these other theories and make findings supporting the guilt of a defendant.'

See also: *State v. Zdiarstek* (1972), 53 Wis. 2d 776, 784, 785, 193 N. W. 2d 833. . . ."

As stated in *State v. Johnson* (1960), 11 Wis. 2d 130, 136, 104 N. W. 2d 379:

". . . The type of reasonable certitude required in criminal cases is moral certainty relating to the affairs of human conduct and grows out of informed experience with the common ways (mores) of man. It is based upon the certain constancy and uniformity in the free conduct of humans under given conditions or motives. Based upon long experience with the actions and motives of human nature, certain inferences of conduct may be drawn from various circumstances to a moral certainty. This is not to say that exceptions and possibilities may not exist but such possibilities in themselves do not prevent a person from forming a reasonable conviction beyond a reasonable doubt or to a moral certainty of the truth of a fact. This degree of certainty required to sustain a criminal conviction may be attained upon circumstantial evidence as well as upon direct evidence." See also: *Bailey v. State, supra,* page 355.

Applying these rules to the above-stated testimony, we conclude that a reasonable jury could have found the defendant guilty, and the judgment and order of the trial court must be affirmed.

The jury, being charged with the determination of the weight and credibility of each witness' testimony, was free to disregard the testimony of the defendant's wife. *See: Ring v. State* (1927), 192 Wis. 391, 394, 395, 212

N. W. 662; Annot. 62 A. L. R. 2d 1191, 1210. In light of her relationship to the defendant, the strength of the inferences against him arising from the direct and circumstantial evidence, and the fact that the jury had the opportunity to observe her demeanor at the time of her testimony, this court cannot say as a matter of law that the jury acted unreasonable in doing so.

The defendant contends that the jury in order to find the defendant guilty had to build inference upon inference rather than established facts. He argues the papers seized were mere pieces of paper and that to find they were tally sheets the jury had to build inference upon inference. We reject this argument. Officer Watters was qualified as an expert witness and as such entitled to state his opinion, even as to an ultimate fact. When the officer testified that the exhibits in question were Bolita tally sheets, the jury, after determining his credibility and the weight to be given his testimony, could find as a matter of fact the exhibits were Bolita tally sheets. The jury could make this finding not based upon inference but a direct statement of fact found in the evidence. The $80 and its proximity to the tally sheets, as well as the possession of these items, are all facts derived from direct testimony. From these facts, coupled with the expert's description of Bolita betting, the jury could draw the reasonable inferences necessary to convict the defendant.

Sec. 945.03 (6), Stats., provides that a person is guilty of commercial gambling who (1) intentionally, (2) for gain, and (3) maintains in this state any of the proscribed gambling material. Dealing with these elements in reverse order, it is clear that the jury could find beyond a reasonable doubt that the defendant maintained the tally sheets. Two of them were found in his home, one in his drawer in his bedroom bearing a date within two days of its discovery and the same date Bolita winners were to be determined.

With respect to the element of "gain," Officer Watters testified that Bolita writers earn 25 percent of the total bets they receive. Because one tally sheet was found under the flap of an envelope containing just under 75 percent of the total bets on the sheet, the jury could have reasonably concluded that the defendant was in fact a writer and had in fact "earned" 25 percent of the bets listed.

Finally, the jury could have reasonably found that the defendant's conduct was intentional. As stated in *Jacobs v. State* (1971), 50 Wis. 2d 361, 365, 366, 184 N. W. 2d 113:

". . . While intent is a state of mind, it is not to be determined apart from the actions of the person involved. The state of mind or intent may reasonably be ascertained from the acts and conduct of a defendant, and the inferences fairly deducible from the circumstances. . . ."

From the circumstances of the instant case, *i.e.,* the presence of two tally sheets in the defendant's home, an inference of intent is fairly deducible.

The defendant was charged and convicted under sec. 939.05, Stats. That statute provides that a "person is concerned in the commission of the crime" if, *inter alia,* he "[d]irectly commits the crime." It is submitted that the evidence adduced at trial was sufficient to establish the guilt of the defendant beyond a reasonable doubt.

*By the Court.*—Judgment and order affirmed.