McLEMORE, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–752–CR. Argued November 29, 1978.—*
*Decided February 27, 1979.*
(Also reported in 275 N.W.2d 692.)

740

For the plaintiff in error the cause was argued by *Barbara B. Berman,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.   Plaintiff in error, John Wesley McLemore, Jr. (hereinafter defendant) brings writs of error to review the judgment entered by the Circuit Court, Branch II, Milwaukee County, the Honorable Christ T. Seraphim, presiding, convicting defendant of one count of armed robbery, contrary to sec. 943.32(1)(b) and (2), Stats. 1973, following a jury trial and to review the order entered September 21, 1976 denying defendant's motion for a new trial.

A criminal complaint was filed against the defendant on January 25, 1974.  The defendant's first trial ended in a mistrial on May 20, 1975 when the jury reported that it was hopelessly deadlocked.  The defendant was convicted as a result of a second jury trial held in February 1976.  The defendant was sentenced to an indeterminate term of not more than seven years in the Wisconsin State Prison.

The principal issues before us are:

1. Was the defendant denied the right to cross-examination, impeachment, and the right to call witnesses in his own behalf when the trial court refused to allow him to call his own polygraph experts to testify as to procedures used by the state's polygraph examiner?

2. Was the defendant denied due process of law because the state refused to produce a transcript of an American Polygraph Association hearing of charges against the state's polygraph examiner?

3. Was the defendant denied the right to remain silent when the prosecutor cross-examined him as to when and to whom the defendant first reported his alibi?

At trial, the state's first witness against the defendant was James Maben who testified that on January 14,

1974, he and his cousin, Jerry Brown, were working at a Clark gasoline station at Ninth and Center Street in the City of Milwaukee. At about 9:15 p.m., a man walked onto the lot. The man, who Maben identified as the defendant, entered the station, shoved a silver looking gun into his ribs and said, "Give me the money." Maben testified that Jerry Brown threw his money on the table, and that he personally gave the defendant $150. About a week later, Maben picked out the defendant's picture at police headquarters as the man who had robbed him. On March 27, 1974, he identified the defendant in a lineup. Maben testified that he was discharged from the Marines because of a bad left eye. Maben admitted that he did not always wear his glasses. However, at the first trial which ended in a hung jury, Maben testified that he was wearing his glasses at the time of the robbery.

On cross-examination, Maben could not recall his former testimony that he gave the robber approximately $30 nor could he remember telling the police after the robbery, that the total amount taken from him and his cousin was $70 or $80. He denied telling the patrolmen that the gun was a twenty-two caliber, blue revolver. He recalled his discription to the police of the robber as a black male, with a mustache, short-cut "Afro" hairstyle, wearing a black leather jacket, and green trousers. He could not remember if he told the police that the robber had a scar or a gold tooth. At the first trial, Maben testified that he did not notice any scars, facial marks, or gold teeth. The record shows that the defendant had a prominent facial scar and a gold tooth in the front of his mouth. The defendant and other witnesses testified that his hair was chemically straightened at the time of the robbery.

Jerry Brown also testified for the state. He testified that he picked out a photograph of the defendant at the police department, but he "wasn't sure that this was

the man, but he looked just like the man." He stated that he did not get a good enough look at the robber to identify him. Brown stated that he picked the defendant out of a lineup. Brown admitted to meeting the defendant at the Cobra Club a few days before the trial. At first, Brown testified that defendant had approached him, but then he stated that the conversation was as follows:

"Well—well, like at first—at first, he said, 'Man, you know I didn't rob you. You know I didn't rob you.' I said, 'I don't know that.' I said, 'Like I said, I am not positive if you not the man or what.' I said, 'I am just going, you know, tell it the way I have been telling it,' and he said, 'What about your cousin? What about your cousin?' I said, 'Well, if you make it sweet, I probably could talk to him.' I was just saying it. I hadn't saw James in what—two, three weeks."

While Brown denied discussing money in return for a change in testimony, he admitted that he would have taken $50 from the defendant.

The state called the polygraph examiner to the stand. Out of the presence of the jury, the court permitted examination as to the qualification of the polygraph examiner, Robert Anderson. The defendant had taken a polygraph examination, pursuant to a stipulation between his then attorney, Jack Gimbel and the assistant district attorney. It appears that through inadvertence Mr. Gimbel did not sign the stipulation. However, the defendant concedes that this omission was inadvertent, and the issue is not raised on appeal.

Anderson testified that he is a polygraph examiner at the State Crime Laboratory, and that he has been a polygraph examiner since 1968 when he finished the federal school at Augusta, Georgia. Before his present job, Mr. Anderson testified that he had conducted more than 800 polygraph examinations while he was in the Army. He added, that he had no way of knowing how many of these examinations resulted in the actual taking

of the polygram. He testified that he had conducted more than 600 polygraph tests at the State Crime Laboratory. He stated that he was a member of the American Polygraph Association (APA), The Wisconsin Polygraph Association, and the Wisconsin Law Enforcement Association.

Anderson stated he was placed on probation status with the APA, following a hearing on charges brought against him. He stated that because of his role in the Mendoza trial [see *State v. Mendoza*, 80 Wis.2d 122, 258 N.W.2d 260 (1977)], Robert Brisentine of the American Polygraph Association filed charges against him. Brisentine alleged at the APA hearing that Anderson had misinterpreted the charts in the Mendoza case, that the procedure Anderson used for arriving at his conclusions was contrary to any recognized teaching of an APA accredited school, and that the procedure used by Anderson was not taught by the Army. He was still on APA probation at the time of this trial.

At the beginning of the trial, defense counsel asked for a copy of the APA transcript. The Assistant District Attorney refused, saying that the transcript was not within the custody and control of the state, and that the defense could obtain a copy as easily as the state. Mr. Anderson was provided counsel by the state at the APA proceedings, and testified that he believed that the State Crime Laboratory had a copy of the transcript. Anderson said that the APA had not prepared an official transcript of its proceedings, but that there was an advance draft copy which was the property of the APA. However, Anderson stated that he had brought his own tape recorder to the proceedings, and he also had transcribed notes taken by a shorthand reporter. The advance draft copy of the proceedings was transcribed by secretaries working for Mr. Brisentine. Anderson testified that a representative of the state Attorney General's office attended the hearings, but that he did not know

whether he had a copy of the proceedings. He did not think that the Milwaukee District Attorney had a copy. The trial court denied defense counsel's request that the witness produce a copy of the transcript.

Out of the presence of the jury, defense counsel made an offer of proof that Mr. Anderson erred in the construction of his control and relevant questions and that Mr. Anderson's scoring of the defendant's polygraph test followed no recognized or approved procedure. The trial court said the defense could cross-examine Anderson before the jury, but that he would not allow the defense to put on any experts to rebut Anderson. Defense counsel stated that denial of the use of the defense experts at the voir dire examination of Anderson and at trial before the jury constituted denial of the defendant's right to a fair trial, to confront witnesses and to cross-examine.

Anderson was then called to testify in front of the jury. He reiterated his testimony about his training and the circumstances surrounding his probationary status with the APA. He testified that based on his polygraph examination it was his opinion the defendant was not telling the truth when he denied robbing the gasoline station.

Additional facts will be presented in the balance of this opinion.

Issue #1: Was the defendant denied the right to cross-examination, impeachment, and the right to call witnesses in his own behalf when trial court refused to allow him to call his own polygraph experts to testify as to the procedures used by the state's polygraph examiner?

A.

In *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), this court held that polygraph testimony is

admissible under certain circumstances. First, the district attorney, defendant, and defense counsel must all sign a written stipulation providing for defendant's submission to the test, and for the admission at trial of the graphs, and the examiner's opinion on behalf of either the defendant or the state. Second, notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, that is, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper circumstances he may refuse to accept such evidence. Third, if the graphs and examiner's opinion are offered in evidence, the opposing party has the right to cross-examine the examiner about: his qualifications and training; the conditions under which the test was administered; the limitations of and possibilities for error in the technique of polygraphic interrogation; and, at the discretion of the trial court, any other matters deemed pertinent to the inquiry. Finally, if the evidence is admitted, the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate whether at the time of the examination the defendant was telling the truth. The jury members should also be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.

However, *Stanislawski* left unanswered the question of whether a defendant who stipulates to the admission of an examiner's opinion is nevertheless entitled to call his own expert witnesses to rebut that opinion. That question was decided in *State v. Mendoza,* 80 Wis.2d 122, 258 N.W.2d 260 (1977).

In *Mendoza,* the defendant was examined by polygraph examiner Robert Anderson. Mendoza offered to prove that Robert A. Brisentine, a "senior polygraph examiner"

for the Army Criminal Investigation Command, would testify that though Anderson testified he had conducted 600 or 700 polygraph examinations in the Army, he had in fact conducted 125 examinations, three of which were inaccurately scored. See *Mendoza, supra,* 80 Wis.2d at 159. In the case at bar, the polygraph administered by Anderson to the defendant was given on September 18, 1974. The Mendoza test was stipulated to on October 12, 1974. However, in the instant case, Anderson testified that he had conducted more than 800 polygraph examinations in the Army. He admitted that Brisentine had asserted that the correct figure was only 123 polygraph examinations.

In the *Mendoza* case, the defendant also offered to prove that some of the test questions were improper, that the scoring system used by Anderson was not an established polygraph method, and that the results interpreted by other experts did not indicate deception.

This court stated in *Mendoza, supra,* 80 Wis.2d at 161 that in stipulating to the admissibility of a particular examiner's opinion, the parties are stipulating at least to the basic qualifications of the examiner.

"But because the stipulation is made before the test is given, it cannot be construed as foreclosing an inquiry into the manner in which the test was given or the sufficiency of the data upon which a particular conclusion is based. We believe that the logical and proper place to make these challenges is at the hearing on admissibility." *Id.*

A four member majority of this court held that the trial court did not abuse its discretion in refusing to allow defendant's experts to testify before the jury. However, the court held that the defendant's expert witnesses could testify before the trial judge at a new admissibility hearing on remand.

In *Mendoza,* in granting a new trial, this court said:

". . . the court holds that the defendant's expert witnesses may testify before the trial judge at a new admissibility hearing preceding the new trial. . ." *Id.* at 162.

The court holds that under *Mendoza,* the defense was entitled to put on its experts to impeach Anderson in the admissibility hearing out of the presence of the jury as to the methods and techniques used by him in the examination of this defendant. This right was not subject to the discretion of the trial court. The refusal to permit the defendant's expert witnesses to testify in the voir dire challenging Anderson's methods, and hence his conclusions, was error requiring reversal and a new trial.

### B.

A minority of this court, including this writer and Justices Hansen and Callow, would overrule our previous holding in *Stanislawski, supra.* The minority would hold that on retrial of this case none of the testimony or evidence as to "lie detector" or polygraph examination is admissible.

In an article in 15 *Am. Crim. Law Journal,* page 29, entitled *"Polygraph Evidence: The Case Against Admissibility In Federal Criminal Trials"* by Michael Abbell, the author cites the problems inherent in relying on "lie box" evidence. In the first place it isn't the "box" with its various readings of a suspect's physical responses during interrogation that determines truthfulness or falsity but the box plus the operator. The author after citing various authorities in the field of polygraphy says:

"The polygraph technique, therefore, does not rely solely on the objective tracings of specific physiological characteristics, but rather on the examiner's interpretation of polygraph charts, modified by his *subjective im-*

*pressions* of the subject's behavioral reactions. . . . The nature of the information available to an examiner, the sources from whom he obtained this information, and his observations of a subject's behavior during the whole polygraph procedure are all likely to affect his interpretation of the polygraph charts. . . ." (p. 40). (Emphasis supplied.)

"It seems likely that different practitioners develop different feelings of what might be indicative of deception . . . Indeed, the role played by these subjective factors may account in large part for . . . findings that even experienced polygraph examiners have an error rate of approximately ten percent when interpreting charts of examinations given by other experienced examiners using the same polygraph techniques." (pp. 40, 41).

The author concludes:

"For these reasons, even under optimal conditions, the results of polygraph examinations lack the reliability of the typical objective forensic tests which are admissible in evidence. . ." (p. 41).

The subjectivity of the interpretation of the charts by the examiner was demonstrated in this case by the testimony of Mr. Anderson himself. He was asked:

*Question*: "Is it possible for two polygraph examiner[s] polygraphists, giving two different polygraph tests to the same subject could reach different conclusions?"
*Answer*: "Yes, that's correct."

Again, Mr. Anderson was asked:

*Question*: "Would you term polygraphy as science?"
*Answer*: "It's a science and art."
*Question*: "What do you mean by art?"
*Answer*: "The scientific portion of polygraphy is the instrumentation, the art portion is the examiner."

The search for truth is too important to be left to an "artist" based on the state of the "art" as it presently exists. In our system the jury is the best means we have found for ascertaining "truth." It is based on hundreds

of years of experience in our Anglo-Saxon system of justice. To safeguard the system of the search for truth we have built up the various rules of evidence, again based on long experience, so that evidence and testimony going to the jury will be free from elements tending to distort the search.

As Abbell points out in his article, the jury may be misled in relying too heavily on "expert" opinion as to the defendant's truthfulness. But, there also exists the danger that issues will be confused and that too much time will be consumed by polygraph evidence. Certainly the latter is well exampled in the instant case with hundreds of pages of record devoted to examination, cross-examination, and argument before the trial court.

"Indeed, the potential for misleading juries is so great that it could be strongly argued that the admission of polygraph results in criminal trials is tantamount to substituting a new form of trial by ordeal—i.e., trial by polygraph—for the constitutionally mandated trial by jury. A defendant's ability to pass a polylgraph test would, in a very real sense, predetermine the eventual conclusion of guilt or innocence by the jury. For this reason, it is doubly important that polygraph results remain inadmissible unless sufficient empirical evidence is developed that juries can adequately deal with them." (p. 53).

The minority concludes that polygraphy in its present state may be useful as an investigative tool, but that its limitations and potential for misleading factfinders are such that it should not be part of evidentiary system.

Issue #2: Was the defendant denied due process of law because the state refused to produce a transcript of an American Polygraph Association hearing of charges against the state's polygraph examiner?

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) held that the suppression by the prosecution of evidence favorable

to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. The *Brady* rule applies as well where the nondisclosure of evidence goes to the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Nelson v. State*, 59 Wis.2d 474, 481, 208 N.W.2d 410 (1973); *Tucker v. State*, 84 Wis.2d 630, 641, 267 N.W.2d 630 (1978).

This court, in applying the *Brady* mandate, has held that the duty to disclose upon demand did not include on either constitutional or statutory[1] grounds, the furnishing of exculpatory evidence not in the exclusive possession of the state. *State v. Calhoun*, 67 Wis.2d 204, 215, 226 N.W.2d 504 (1975).

From the record in this case it appears that the defense had access to the material in question, with defense counsel cross-examining Anderson citing numbered pages in the APA transcript. A copy of the transcript has been made part of the record on this appeal, and would be available to the defense at a new trial. Under these facts, and since we reverse on other grounds, we decline to address the issue any further.

Issue #3: Was the defendant denied the right to remain silent when the prosecutor cross-examined him as to when and to whom the defendant first reported his alibi?

The defendant in this case relied on an alibi defense. His alibi was that he was at a going-away party for an acquaintance at the Cobra Club at the time of the robbery. On cross-examination, the prosecutor questioned

---

[1] The defendant's argument does not refer to the discovery statutes, secs. 971.23, 971.24, and 971.25, but relies on the constitutional duty of the prosecutor to disclose exculpatory evidence.

the defendant repeatedly as to when he first made his alibi known.

The District Attorney asked:

"Q. And when was the first time that you realized in your own mind that the night of the armed robbery you were at the Cobra Club?

"A. When you told me it was the 14th, I realized.

"Q. You knew it immediately?

"A. I knew it. I knew it. He gave me a time limit. He says that it happened in the afternoon and he asked me where was I that particular afternoon, and I told him that I don't keep tabs on myself where I be in the afternoon, and he gave me the date, the 14th, and when he said the 14th, I knew on the 14th we were giving Shirley a going-away party.

"Q. Who did you tell that to?

" . . .

"Q. When you were arrested, how many officers arrested you?

"A. Two.

"Q. And did you tell them that?

" . . .

"Q. Okay, fine. Now, when did you first tell the District Attorney's Office that you had an alibi?

" . . ."

The prosecutor also asked the defendant whether he had made his alibi known to the judge at his initial appearance, at the time he waived preliminary hearing, at the arraignment, at the time he took his polygraph examination. The trial court also questioned the defendant on his alibi, asking: "I—maybe it can be done this way. When was the first time, sir, you let anybody know other than your attorney that you had an alibi? That's what he's trying to get at?"

Although defense counsel should have objected the first time the defendant was questioned about his alibi, he did so on the later questions, and moved for a mis-

trial on the ground that the questioning by the district attorney was prejudicial. In the interests of justice, we exercise our discretion to review the error because the outcome of this case might very well have been different but for this highly prejudicial series of questions. *Claybrooks v. State,* 50 Wis.2d 79, 85, 183 N.W.2d 139 (1971) ; *McAdoo v. State,* 65 Wis.2d 596, 612, 223 N.W.2d 521 (1974). We note that the testimony of the state's witnesses was impeached in important details, and one witness admitted he would have accepted $50 from the defendant in a proposed attempt to change his cousin's testimony.

In *Reichhoff v. State,* 76 Wis.2d 375, 380, 251 N.W.2d 470 (1977), this court condemned use by the prosecutor of the defendant's custodial silence, commenting ". . . reference to the defendant's silence does 'no more than turn on the red light of potential prejudice involving the defendant's fifth amendment rights.' " *United States v. Arnold,* 425 F.2d 204, 206 (10th Cir. 1970).

In *Doyle v. Ohio,* 426 U.S. 610 (1976), the defendants took the stand at trial and gave an exculpatory story which they had not previously told the police or the prosecutor. The Supreme Court rejected the state's position that the prosecutor had the right to cross-examine as to post-arrest silence for the purpose of impeaching the defendants' testimony.

"Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker,* 417 U.S. 433, 443–444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence, in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every

post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale, supra,* at 177. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Footnotes omitted: *Id.* at 617–18.

In *Doyle, supra,* 426 U.S. at 619, the Court said in footnote 11: "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild,* 505 F.2d 1378, 1383 (CA 5 1975)."

In *Fairchild,* the defendant had opened the door to an inquiry by the prosecutor on defendant's post-arrest silence by creating the false impression that he had cooperated with the police when in fact he had not. In that case, defendant's counsel had asked an FBI agent on the stand, "During the period of time that this investigation has been going on, to your knowledge has Mr. Fairchild cooperated fully with the FBI and U. S. Attorney's office in responding with anything that you all wanted?" 505 F.2d at 1383. The court commented: "Assuming the law would have excluded from evidence Fairchild's silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created to protect him." *Id.*

Similarly, in *United States v. Griffin,* 530 F.2d 101 (5th Cir. 1976), the defendant's testimony created the

misleading impression that the prosecution had been previously informed of his defense. Griffin, who was convicted of interstate transportation of a stolen vehicle, asserted at trial that he had purchased the stolen car from a "Paul Brown," and that he obtained possession only after it had completed its interstate journey. "Paul Brown" did not appear at trial and the address attributed to Brown turned out to be occupied by a city park. When Griffin took the stand to offer his defense, he was closely cross-examined as to his knowledge of "Paul Brown." The following coloquy was held to be proper:

"Q. You don't know anyone that knows him? [Brown].
"A. Do I know anyone that knows him? I can't say that I know anyone that knows him. I know that I was introduced to him by mutual friends of both of us.
"Q. Who?
"A. I don't know who that is. As I said, it has been five years.
"Q. Have you checked back among your mutual friends in New York to try to locate him?
"A. I had no need to. I figure you would do that, that you would have Mr. Brown here.
"Q. Let me ask you, have you ever told me the story before today?
"A. I assumed that you knew it.
"Q. I asked you had you ever told me this story before?
"A. No.
"Q. Have you ever told members of the Federal Bureau of Investigation this story?
"A. I have not talked to members of the Federal Bureau of Investigation.
"Q. Right. Have you ever told any law enforcement officer this story before today?
"A. No, no need to."
*Id.* at 102, fn. 1.

The Court in *Griffin,* said that defendant had created the impression that the prosecutor either had failed to

investigate his story or suppressed the results of his investigation. "Through his responses on cross-examination here, as through his counsel's questions on direct there, the defendant attempted to create misleading inferences. In each case, his prior silence directly refuted the inferences which he voluntarily introduced into the case." *Id.* at 103. Significantly, Griffin, by his answer, "I had no need to. I figure you would do that, that you would have Mr. Brown here," first raised the issue of the prosecutor's knowledge of his story.

In the instant case, the defendant gave no direct testimony concerning his previous statements or cooperation. It was the district attorney who first raised the issue of when he had made his alibi known, not the defendant. The response, "I told it to one of the officers," came only after the prosecutor brought the subject up. Thus, constitutional error was committed in this case.

Constitutional error is subject to the harmless error rule. *Reichhoff v. State, supra.* In assessing the impact of the error, the court must consider the impact of its repetition, the nature of the state's evidence, and the nature of the defense. *Reichhoff, supra,* 76 Wis.2d at 381. As in *Reichhoff,* this was not a case where the prosecution casually asked an isolated question about the defendant's silence. Rather, the prosecutor emphasized the matter in a lengthy series of questions.

The defendant's defense was his alibi. The district attorney's improper questioning of the defendant on his failure to reveal his alibi to the authorities created the impression that the defendant had merely fabricated the story. Thus, the questioning by the prosecutor was highly prejudicial, and reversal is required on this ground also.

The questioning of the defendant's alibi witnesses stand on different footing, however, No *Miranda* rights were involved in the questioning of the alibi witnesses as to why they had not told the police earlier that the defendant was with them on the night in question. This situation is similar to that in *Shadd v. United States,* 423 F. Supp. 511 (W.D. Pa. 1976). In that case, the defendant's alibi witness Groomes was cross-examined as to why he had waited for nearly a year before coming forward with his alibi story as to the defendant's whereabouts on the day of the bank robbery. The court distinguished *Doyle,* and commented:

"There is nothing in the record to indicate that Mr. Groomes was ever arrested for this bank robbery or that his silence before trial was possibly a post-arrest silence resulting from Groomes' reliance on *Miranda* warnings. However, even if the impeachment of witness Groomes somehow did violate Mr. Groomes' personal Fifth Amendment rights, petitioner Shadd may not claim it as error. *California Bankers Ass'n. v. Shultz,* 416 U.S. 21, 55, 94 S. Ct. 1494, 39 L.Ed.2d 812 (1974); *Couch v. United States,* 409 U.S. 322, 328, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *United States v. Skolek,* 474 F.2d 582, 584 (10th Cir. 1973); *Long v. United States,* 124 U.S. App. D.C. 14, 360 F.2d 829, 834 (opinion of Chief Justice, then Circuit Judge, Burger) (1966). Petitioner could expect that his alibi witness would be tested on cross-examination, under the accepted rules of evidence, just as any other witness. See 3A Wigmore, Evidence §1042 (J. Chadbourne rev. 1970)." *Id.* at 514.

In view of our ruling that this matter must be returned for a new trial, other questions raised by defendant need not be considered.

*By the Court.*—Judgment and order reversed and cause remanded for a new trial.